STATE

v.

Robert BLUITT.

No. 2002–181–C.A.

Supreme Court of Rhode Island.

June 7, 2004.

Lauren Sandler Zurier, Providence, for Plaintiff.

Kelly Monteiro, Providence, for Defendant.

Present: WILLIAMS, C.J., FLANDERS, GOLDBERG, and SUTTELL, JJ.

## OPINION

PER CURIAM.

Was this defendant's waiver of his right to counsel during his trial on sexual-assault charges knowing and intelligent? The defendant, Robert Bluitt, appeals from a judgment of conviction on one count of first-degree sexual assault and on one count of second-degree sexual assault against his biological granddaughter. He was sentenced to twenty-five years: eighteen years to serve on the first count, and three years to serve on the second count, to run concurrently.

He asserts on appeal that the trial justice erred in allowing him to proceed to trial without any attorney representing him and without first determining whether he knowingly and intelligently waived his right to counsel. He also contends that the trial justice erred in not granting him sufficient time to find another attorney after he discharged his privately retained attorney immediately before his trial began. Finally, he argues that the trial justice erred in admitting the complainant's clothing into evidence because of gaps that existed in the chain of custody.

In 2000, defendant was indicted on two counts of first-degree sexual assault, in violation of G.L.1956 § 11–37–2 and § 11–37–3, and on one count of second-degree sexual assault, in violation of § 11–37–4 and § 11–37–5.[1] An attorney from the

1. The jury acquitted the defendant on one of the counts of first-degree sexual assault, charging him with having committed digital penetration by force or coercion.

public defender's office originally represented him, but at his bail hearing, defendant expressed a desire to retain his own counsel. On October 27, 2000, attorney Edward Roy, whom defendant had retained privately, entered an appearance on defendant's behalf. When the court reached the case for trial, defendant was incarcerated at a facility of the Adult Correctional Institutions (ACI).

On June 18, 2001, just before the lawyers were about to pick the jury, defendant asked to speak with the trial justice. Mr. Roy explained that defendant was discontented with a motion *in limine* he had filed to preclude the prosecution from introducing into evidence several of defendant's previous contacts with the criminal justice system dating to the 1960s. The defendant then explained that he thought that someone had falsified his criminal record and that someone had tampered with a witness statement. Also, he said he wanted his lawyer to go to New Jersey, where he and the complaining witness were from, to investigate their respective backgrounds and characters. After attempting to address some of defendant's issues, the trial justice indicated that he was going to bring the jury panel down to the courtroom.

Before the court could do so, defendant voiced additional concerns about the quality of his legal defense. The trial justice responded that the charges against defendant were "very, very serious" and he expressed confidence that "Mr. Roy will explore every possibility." He also explained to defendant that the trial itself would provide an opportunity to bring out some of the issues he was raising. The trial justice further commented that he did not usually allow defendants to make long statements to the court before jury selection. He added, "I've tried to accommodate you because I know you have some general concerns. I know this a very high

stakes case and I want you to realize that you're going to get a fair trial." The defendant responded, "[b]ut what I'm saying, I'm not satisfied with the way Mr. Roy ha[s] done my case." The judge said, "I understand that, sir. You have stated that for the record. Let's see how things develop."

At that point, defendant asked whether he could get another lawyer, and the judge responded that the trial was going to start "in about two minutes * * *. [Y]ou haven't asked for a continuance, but I won't grant you a continuance just because you might want another lawyer." The defendant replied, "[t]here is no might in this. I want another lawyer." Again, the judge indicated that if defendant was asking for a continuance, that request was denied. The defendant asked once more whether he could get another lawyer, and the judge told him that they were ready to bring in the jury panel.

After the court empaneled a jury, but before the testimony could get underway, the trial justice dismissed the jury for the day. In a chambers conference with the attorneys, he indicated that he thought defendant was engaged in a delaying tactic, and he saw no reason to allow such a delay.

The next day, the court scheduled the trial to resume in the afternoon. Before the jury arrived, the trial justice handled some preliminary matters, and then he once again permitted defendant to address the court. The defendant wanted to ensure that the record reflected that he had asked to dismiss his attorney, and "that you [the court] denied me that right." He added that "Mr. Roy no longer works for me." The trial justice reiterated that the charges against defendant were "very, very serious * * * [a]nd obviously, I can't force you to accept the legal services of someone you have already fired, but I'm

certainly not about ready to, on this record, be convinced that you can represent yourself." The defendant agreed that he was not able to represent himself.

The defendant then reiterated that he was discharging Mr. Roy. When the trial justice began to respond that "if we go forward without Mr. Roy in five minutes," defendant interrupted: "I'll go forward without a lawyer." The trial justice expressed concern about defendant's facing trial without an attorney, noting that "[y]ou need a lawyer and you need a good, experienced lawyer like you presently have." The defendant said that he could find another lawyer, adding "I got to be represented. I know this." The trial justice continued to press defendant on whether he was formally discharging his attorney, and defendant continued to respond that he was. The trial justice then stopped the hearing, brought the jury in only to dismiss it again for the day, and offered defendant a chance to rethink his position overnight. He said he might grant a brief continuance for defendant to find another attorney, but he expected defendant to present a plan the next day concerning how he was going to proceed with his representation at trial.

The next morning, the trial justice discussed with the attorneys at some length defendant's decision to dismiss Mr. Roy and, as the trial justice construed it, defendant's request for a continuance to obtain new counsel. At one point, the prosecutor said:

"The only other issue, Judge, is with regards to the pro se. And I'm sure you already know this. *You have to make all these options clear to him on the record, and I don't know, but I'm wondering if, out of an abundance of caution, if there should be some questions as to his ability concerning representing himself.*" (Emphasis added.)

The trial justice replied that, according to his research, that was not an issue.

When defendant came into the courtroom, the trial justice inquired whether he had retained another attorney, and defendant, who was still incarcerated at this time, indicated that the court did not give him enough time to do so. The trial justice reviewed the situation, noting that Mr. Roy was an experienced and skilled attorney and that defendant was "a very articulate, apparently well-educated, if self-educated, mature man." The trial justice also said that "this defendant is well acquainted with court proceedings, and whereas his criminal record may have no relevance whatsoever to the trial of this case, * * * I can consider the fact that Mr. Bluitt knows his way around the courthouse by reason of his prior contacts with various criminal justice systems." Expressing concern about delaying the trial any further, the trial justice determined that the trial would continue. The trial justice declared that defendant was representing himself, and he appointed Mr. Roy as standby counsel. The defendant appeared to object to this arrangement, but the trial continued shortly thereafter.

After his granddaughter testified to the acts of sexual molestation, defendant again refused Mr. Roy's assistance and, outside the presence of the jury, said, "I might have one or two questions, then I ain't going to say no more through the whole trial. From here on in I'll only say one thing. I only ask [the granddaughter] one question, no more." When the jury was present, however, defendant declined the opportunity to cross-examine the witness. The trial justice asked defendant earlier how he wanted to handle cross-examination. The defendant responded emphatically that Mr. Roy was not his attorney, and therefore was not going to handle cross-examination. But defendant also

added: "I cannot cross-examinate [*sic*] nobody here because I don't have the education, the knowledge to do so. I mean, I could ask somebody something, but I can't prove it. This is the problem."

But defendant did conduct very limited cross-examinations of several other witnesses, including Mukesh Patel, the proprietor of the Classic Motor Lodge in West Greenwich, where the charged acts of sexual molestation took place. The defendant declined, however, to cross-examine several other witnesses, including Sharon Elizabeth Mallard, an employee of the Rhode Island Department of Health in the forensic biology laboratory, Trooper Scott Edward LeBeau, of the Rhode Island State Police, and Sergeant William Labossiere, the head of the criminal identification unit for the Rhode Island State Police.

The issue of whether defendant's self-representation in this case was voluntary—as well as the knowing and intelligent nature of his decision to choose that status—continued to arise during the trial. Before the start of proceedings on June 22, 2001, defendant took issue with Mr. Roy's presence in the courtroom. The trial justice explained, again, that he had appointed Mr. Roy as standby counsel, and, therefore, Mr. Roy was under court order to be present. The defendant complained that the judge had not kept his promise to conduct a fair trial: "You [the trial justice] told the jury that I had gotten rid of Mr. Roy here, and I was going to represent myself. I never said that [I was going to represent myself] * * *." The defendant reiterated that not only was Mr. Roy not speaking for him, but that "I'm not speaking for myself." A little later, when asked whether he wished to question a state police witness about a copy of a taped statement by defendant, defendant said that he was "not speaking until I get another attorney."

After the state rested, the trial justice asked defendant whether he wanted to make an opening statement. The defendant took the opportunity to point out, yet again, that he was not represented, he was not a lawyer, he was not representing himself, and he was in no position to represent himself. There were several character witnesses for defendant who had arrived from New Jersey, and the trial justice offered to call them and ask them for their opinion about the defendant's character. After some discussion, defendant said he would not authorize the court to call the witnesses, saying: "If I got to represent myself in order to do it, I'm not representing myself." He changed his mind, however, and the court called seven character witnesses on his behalf, including defendant's daughter, Cynthia Bluitt, his sister, Alice Minor, and his wife, Dorothy Bluitt.

After further consideration, defendant decided to testify and to permit Mr. Roy to question him on direct examination. He acknowledged driving to Rhode Island with his granddaughter, checking into a motel room, and falling asleep in bed. He also acknowledged that "there was sex," but he said he was asleep when it happened and he did not realize with whom he was having sex at the time. He said later that he realized it must have been his granddaughter because no one else was in the room, but he was not fully aware or awake at the time. He denied ever forcing the girl to have sex with him.

The jury found the defendant guilty on one count of first-degree sexual assault and one count of second-degree sexual assault, after which the court denied his motion for a new trial.

■ On appeal, defendant raises three issues. First, he acknowledges that his decision to discharge his attorney in the face of the denial of his requests for a new

attorney or a continuance meant that his decision to do so was voluntary. Nevertheless, he asserts, the key issue is whether his waiver of the right to counsel was also knowing and intelligent. In this regard, he argues that the trial justice utterly failed to fulfill his duty to inquire of defendant about the depth of his understanding concerning what self-representation meant, and to warn him adequately about the dangers and disadvantages of proceeding to trial *pro se*. According to defendant, the trial justice should have conducted an inquiry to establish, on the record, that he fully understood and appreciated the downside risks of what he was doing when he discharged Mr. Roy, and that the totality of the circumstances did not reveal that his waiver was knowing and intelligent.

The state responds that the on-the-record inquiry defendant now demands was not constitutionally required. In any event, the state contends that the trial justice touched upon several of the factors that this Court discussed in *State v. Chabot*, 682 A.2d 1377, 1380 (R.I.1996) (per curiam), and that a review of the record supports a determination that defendant's waiver of his right to counsel was knowing and intelligent.

In *Chabot*, 682 A.2d at 1378–79, the defendant's waiver of counsel arose during a probation-revocation hearing at which the defendant's competency to represent himself was in doubt because of his recent hospitalization for psychiatric care. In that context, we said a court should consider the following factors:

"(1) the background, the experience, and the conduct of the defendant at the hearing, including his age, his education, and his physical and mental health; (2) the extent to which the defendant has had prior contact with lawyers before the hearing; (3) the defendant's knowl-

edge of the nature of the proceeding and the sentence that may potentially be [imposed]; (4) the question of whether standby counsel has been appointed and the extent to which he or she has aided the defendant before or at the hearing; (5) the question of whether the waiver of counsel was the result of mistreatment or coercion; and (6) the question of whether the defendant is trying to manipulate the events of the hearing." *Id.* at 1380.

But in *State v. Spencer*, 783 A.2d 413, 417 (R.I.2001), we stressed that consideration of the six *Chabot* factors was mandatory only in cases in which the mental competency of the defendant is questioned; in all other cases, the factors are relevant but need not be addressed factor by factor.

In *State v. Thornton*, 800 A.2d 1016 (R.I.2002), we again discussed the standards for determining whether a defendant's waiver of counsel was valid. In that case, the defendant opted to proceed to trial *pro se*, with standby counsel, after rejecting his court-appointed attorney's assistance. *Id.* at 1024. The trial justice had offered him the option of retaining his private counsel or proceeding *pro se*. *Id.* On appeal he argued that his waiver of counsel was not made knowingly and intelligently. *Id.* at 1025. The Court noted that it "determine[s] first, whether the waiver was 'voluntary,' and second, whether the waiver was 'knowing and intelligent.'" *Id.* The defendant in *Thornton* had rejected several experienced attorneys, evidently without good reason. *Id.* Such a refusal, the Court held, was functionally equivalent to a voluntary waiver of the right to counsel. *Id.* at 1026. Therefore, the Court focused on whether the defendant's decision to represent himself was knowing and intelligent. *Id.* The defendant initially had objected to proceeding *pro se*, saying "I'm driving blind here"

and "I don't know what I'm going to be doing to represent myself." *Id.* at 1023. On appeal, he then suggested that his waiver was invalid because the trial justice did not conduct an inquiry under *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) and did not fully advise him of the dangers and disadvantages of self-representation. *Thornton,* 800 A.2d at 1026.

█ In *Faretta,* 422 U.S. at 835, 95 S.Ct. 2525, the Supreme Court reaffirmed the right of a criminal defendant to represent himself. It reiterated, however, that because of the loss of certain benefits associated with the right to counsel, a defendant must knowingly and intelligently forgo those benefits. *Id. See also Iowa v. Tovar,* —— U.S. ——, ——, 124 S.Ct. 1379, 1387, 158 L.Ed.2d 209 (2004) (reaffirming that federal constitution requires that any waiver of a right to counsel be knowing, voluntary, and intelligent). A defendant "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Faretta,* 422 U.S. at 835, 95 S.Ct. 2525 (quoting *Adams v. United States ex rel. McCann,* 317 U.S. 269, 279, 63 S.Ct. 236, 87 L.Ed. 268 (1942)).

The majority of this Court in *Thornton,* 800 A.2d at 1025, however, concluded that the defendant in that case had elected to proceed to trial on a *pro se* basis with his "'eyes open.'" The Court analyzed the *Chabot* factors, and concluded:

> "[T]here is ample evidence in that record to establish that Thornton voluntarily, knowingly, and intelligently waived his Sixth Amendment right to counsel, and contrary to the dissent's contention, no specific finding on the record by the trial justice to that effect was required." *Thornton,* 800 A.2d at 1031.

As noted, the trial justice here treated defendant's comments about discharging Mr. Roy and needing another attorney as a request for a continuance to obtain a new lawyer, which request the trial justice denied. But the court never advised defendant that it was treating defendant's discharge of Mr. Roy as a waiver of his right to counsel. Although he was prompted by the prosecutor at one point to inquire about defendant's ability to represent himself, the trial justice responded that, according to his research, this was not an issue. *Thornton,* and *Spencer,* make clear that although such an inquiry is preferable, it is not mandatory if the totality of the circumstances otherwise allows the court to infer that the waiver was voluntary. The Court in *Spencer,* 783 A.2d at 417 said that it must look at "the totality of the circumstances, in light of the particular stage of the proceedings at the time the waiver is proposed" to decide whether a waiver is knowing, voluntary, and intelligent.

The situation in this case is troubling to us because even though the trial justice said that defendant was articulate and self-educated, it appears from our review of the record that defendant often rambled and sometimes appeared confused (perhaps deliberately so) about whether his decision to discharge Mr. Roy meant that he was going to have to act as his own attorney during the trial. Moreover, unlike *Thornton* and *Spencer,* this is not a case in which defendant advised the court that he wanted to represent himself at the trial. On the contrary, unlike the defendants in *Thornton* and *Spencer,* this defendant strenuously objected to proceeding to trial on a *pro se* basis, even with standby counsel, and he kept insisting that he was not acting as his attorney. In our opinion, the trial justice could have and should have done more to determine on the record whether (1) defendant understood that his

decision to discharge his attorney as the trial was about to begin meant that he would be deemed to have voluntarily waived his right to counsel because the court would not allow him a last-minute continuance to obtain another attorney and that, therefore, he would be representing himself at trial, whether or not he wanted to do so; and (2) that this "voluntary" waiver of counsel was also knowing and intelligent because the court made sure that defendant was aware of the dangers and disadvantages of representing himself during the trial before the court acquiesced in defendant's decision to discharge his attorney on the eve of trial.

To be sure, the trial justice repeatedly attempted to discourage defendant from proceeding to trial without an attorney. But he never made defendant aware that, by discharging Mr. Roy as the trial was about to begin, he then would have to represent himself at trial, with all the dangers and disadvantages of self-representation that such self-imposed *pro se* status entailed. Nor does the record otherwise show any knowing and intelligent waiver of defendant's right to have his own attorney represent him at trial. Much less was it clear that defendant understood that, by firing Mr. Roy, he thereafter would be representing himself at trial, and that he would be doing so notwithstanding all the potential pitfalls that such a *pro se* status would entail.

The trial justice noted that defendant's decision to discharge his attorney occurred as the trial was about to start, and he found that defendant's professed desire to change his attorney essentially was a stalling tactic. He also found no conflict of interest or irreparable communications breakdown between defendant and his attorney. Finally, like the trial justice in *Thornton*, the trial justice here showed great solicitude toward defendant through-

out the trial in light of his *pro se* status. Yet, the trial justice never took any steps to make sure that the record reflected that defendant appreciated the fact that, by discharging his attorney just before the trial would begin, he would now be facing all the burdens, dangers, and downside risks of representing himself at trial. Indeed, he spurned the prosecution's request that he do so. And, unlike *Thornton*, nothing else in the record provides us with an equivalent assurance that defendant knowingly and intelligently waived his right to counsel. On balance, therefore, the trial justice's failure to probe more deeply into whether defendant knew that discharging Mr. Roy would be treated as a waiver of his right to counsel and that this waiver was knowing and intelligent, persuades us to sustain defendant's appeal, especially when the record lacks any factual basis from which we can conclude that defendant knowingly and intelligently waived his right to counsel. Given our disposition of this issue, we have no need to reach defendant's other arguments for overturning his conviction.

In sum, the trial justice erred in failing to make sure the record reflected that the defendant's waiver of his right to counsel was knowing and intelligent. Instead, the court rebuffed the prosecution's suggestion to inquire of the defendant about his ability to represent himself at trial; much less did the trial justice take steps to ensure that the record reflected the defendant's awareness of the dangers and disadvantages of self-representation before the court advised the defendant that, by discharging Mr. Roy on the eve of trial, he was going to be left to represent himself at trial, whether or not he preferred to do so. The defendant's presumed knowledge of the criminal justice system (based upon his previous contacts with that system) did not constitute, in and of itself, proof he was aware of the dangers and disadvantages of

serving as his own trial attorney. The trial justice deemed the defendant's concerns about his need for new legal representation as a request for a continuance to obtain a new attorney and as a stalling tactic. But even if the trial justice's suspicions on this score were correct, this circumstance did not excuse the trial justice's failure to make sure that the record revealed that the defendant's waiver of his right to counsel was not merely voluntary, but also knowing and intelligent. The court's failure to do so constituted reversible error.

For the reasons discussed above, we reverse, vacate the convictions, and remand for a new trial.

Justice FLAHERTY did not participate.