**Supreme Court**

No. 2013-281-C.A.

(P3/12-3306A)

State                 :

v.                 :

Ana M. Cruz.         :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                    :

v.                       :

Ana M. Cruz.             :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Chief Justice Suttell, for the Court.**   The defendant, Ana M. Cruz, appeals from a Superior Court judgment of conviction, having been found guilty on two counts: (1) resisting arrest in violation of G.L. 1956 § 12-7-10; and (2) disorderly conduct in violation of G.L. 1956 § 11-45-1.   On appeal, the defendant argues that her right to counsel, guaranteed by the Sixth Amendment to the United States Constitution and article 1, section 10 of the Rhode Island Constitution, was violated when the trial justice allowed her to represent herself at trial without first determining whether she had made a knowing and intelligent waiver of her right to counsel. This case came before the Supreme Court pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided.   After considering the parties' written and oral submissions and reviewing the record, we conclude that cause has not been shown and that this case may be decided without further briefing or argument.   For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

# I

# Facts and Procedural History

On July 7, 2012, police officer Jared Hardy of the Cranston police department received a dispatch call regarding a "report of a one-year-old walking around nude in the street" near 57 Lakeside Drive. Because that area in Cranston was part of Officer Hardy's "beat," he drove there immediately in order to respond to the call. Officer Hardy arrived, ninety seconds later, at 57 Lakeside Drive in his patrol car and dressed in his police uniform. After scanning the area for children, he did not find a nude child in front of that address. Therefore, he approached the residence at 57 Lakeside Drive and unsuccessfully tried to "raise the resident." He testified that he rang the doorbell, as well as knocked several times. Officer Hardy testified that he heard "children's voices coming from the backyard," which led him to go around to the back, because "that[] [was] the nature of the call." Next, he entered the backyard; he testified that he did not have to pass through a fence or gate to do so.

Once in the backyard, Officer Hardy testified, he saw two young males, approximately five and three years of age. Further, he described, "[t]he three-year-old was wearing a T-shirt, underwear, no pants and he was playing around in a patio that had several pieces of broken glass spread about it." Officer Hardy testified that the backyard was on a steep hill, which led directly down to a lake without anything besides "a lightly wooded area" obstructing access to the water. He stated that these children were not being supervised at the time in the backyard. At trial, defendant's daughter, Esmerelda Morontoro, testified that she was in the upstairs window at the time throwing a toy parachute down to the children while they were playing in the backyard. While still in the backyard, the officer questioned the children about the present location of their parents. In response, the smaller child indicated that his mother was inside and offered to bring

the officer to her.  Officer Hardy testified that "[t]here [wa]s a three-year-old I don't think should be unsupervised especially around a lake, pantless and barefoot in a glassy area.  I think it was a dereliction of my duty if I walked away from that three-year-old with no adult supervision."  Consequently, the officer followed the two children into the home to find the boy's mother.

After walking through a playroom and kitchen, he entered a living room where he came upon four women in conversation.  Officer Hardy testified that defendant was among the group and that he asked the women which one was the mother of the scantily-clad three-year-old.  At trial, defendant testified that she was cleaning up the living room when the officer entered her home and she asked, "could I help you?"  Because Officer Hardy entered the home to find the smaller child's mother, he continued to pursue that line of questioning with the women.  At trial, the officer testified that he believed one of the women, Crystal Bretton, was the smaller child's mother based upon his observations of the child pointing to her and her ensuing nervous demeanor.  According to defendant's testimony, Bretton was upstairs when the officer entered; shortly after she came downstairs, Officer Hardy said that he was going to call the Department of Children, Youth and Families (DCYF).  Officer Hardy, however, repeatedly denied that he ever made any call or reference to DCYF.

Officer Hardy testified that defendant was "getting between me and [Bretton] and beginning to raise her voice."  Furthermore, he testified that defendant was "pointing her finger in my face.  Everything she sa[id] [wa]s in an aggressive manner, you don't have a right to be talking to my daughter,[1] you don't have the right to be in here."  Officer Hardy testified that defendant had put her hands on him "several times," including pushing his hand down as he tried to write.  As this behavior continued, tensions escalated among the parties.  Abruptly, Bretton

---

[1] The defendant stated to the trial justice that Bretton was her daughter.

ran from the house and Officer Hardy pursued her. This swift departure prompted defendant to go out into the street where, according to the officer, she yelled, "you don't have the right to ask her any questions, don't tell him anything." While defendant, Officer Hardy, and Bretton were outside, the melee intensified; Officer Hardy testified that defendant grabbed Bretton and told her to run to the house, then the officer grabbed Bretton and felt defendant "jump onto [his] back."[2] Officer Hardy explained that he used his shoulder radio to call for backup, saying "they're fighting with me." He further testified that this trio then re-entered the house with defendant still on his back. Soon after other police officers arrived, Officer Hardy was finally able to handcuff and arrest defendant when he "pushed [defendant] into a bedroom and pushed her facedown on the bed." After the arrest, the officer escorted defendant outside and placed her in a police cruiser. Subsequently, Bretton was also apprehended and arrested.

Following the chaotic events at her home, defendant was charged with: (1) assault and battery in violation of G.L. 1956 § 11-5-3; (2) resisting arrest in violation of § 12-7-10; and (3) disorderly conduct in violation of § 11-45-1. After a District Court trial on November 28, 2012, defendant was found not guilty of assault and battery and guilty of resisting arrest and disorderly conduct. The defendant received a one-year guilty filing on the resisting arrest offense and twenty hours of community service on the disorderly conduct offense. The defendant appealed her conviction to the Superior Court on November 28, 2012. A jury trial occurred in the Superior Court on June 11 and 13, 2013, on the counts of resisting arrest and disorderly conduct.

---

[2] Following Officer Hardy's testimony regarding these alleged actions of defendant, the trial justice instructed the jury that defendant was found not guilty of the charge of assault in a prior proceeding before a different judge. Subsequently, the trial justice in her jury instructions told the jurors that they should not consider any evidence of alleged facts giving rise to the assault charge of which defendant was previously found not guilty in District Court.

## Waiver of Counsel

Prior to the trial, the trial justice offered defendant, who at the time was represented by counsel, the opportunity to accept a one-year filing, during which period defendant would maintain her not-guilty plea on the condition that she "keep the peace and be of good behavior." The charges would then be dismissed. The defendant rejected the offer, and the trial justice proceeded to empanel a jury.[3]

---

[3] The trial justice engaged in a colloquy with defendant regarding her option to maintain her not-guilty plea on a one-year filing rather than proceed to trial, a portion of which we quote below:

> "THE COURT: * * * If you abide by that condition of being peaceful and not committing any new crimes for a one-year period, after the year ends, everything, all these records, are destroyed, the case goes away completely. So that is my intention here because it allows you to continue to say not guilty, you get the benefit of not having a jury find you guilty and potentially being sentenced more harshly than you were in the District Court. You don't have to admit guilt. * * *

> "THE DEFENDANT: Your Honor, the way I see things is no matter what it is I'm still guilty. We are in my own home and this officer comes into my back door. We haven't done anything wrong. He comes in. * * * I'm Spanish. I have never had any problems. I lived there for seven years. I'm hard-working in the community. I do a lot of community work all my life, plus I have my job and I feel that my rights were violated. If I decide to take this deal, no matter what, they are allowed to come back into my house and find me guilty of anything because this is not the first time that a police officer comes into my home without me opening my door and accusing. I am not drug dealing, I am not a prostitute and I am not a thief. Because I'm Spanish, I'm in the wrong neighborhood.

> "* * *

> "THE COURT: Even though I'm saying that you're not guilty?
> "THE DEFENDANT: Your Honor --
> "THE COURT: Are you telling me that you would rather have a jury trial?
> "THE DEFENDANT: Yes.

Partway through jury selection, after the luncheon recess, defendant's counsel informed the trial justice that defendant had told him that she wanted to represent herself at trial. The trial justice then engaged in a detailed discussion with defendant on the record regarding her decision to proceed without representation. Because defendant's knowing and intelligent waiver of her right to counsel lies at the heart of this appeal, we reproduce the colloquy in its entirety:

> "THE DEFENDANT: Yes, your Honor. I believe if I don't have a chance to get another lawyer, I would like to represent myself.
>
> "THE COURT: Well, the problem is we're in the middle of picking a jury and you wanted a trial this morning.
>
> "THE DEFENDANT: Yes.
>
> "THE COURT: You had no trouble with your lawyer then. You had no trouble with your lawyer, to my knowledge, while we were picking the jury and I'm going to finish the trial.
>
> "THE DEFENDANT: The problem was when I came out what my lawyer has told me I feel that I could do it better myself.
>
> "THE COURT: So do you want to represent yourself in this trial?
>
> "THE DEFENDANT: Yes.
>
> "THE COURT: Do you understand that you'll be required to do everything at this point?
>
> "THE DEFENDANT: Your Honor, I do not know how to write and read. Is that a problem? If I represent myself, would that be a problem?
>
> "THE COURT: Do you know how to represent yourself?
>
> "THE DEFENDANT: No, your Honor.

> "THE COURT: Okay, let's have a trial. I understand your introspective. The state wants to push this case to trial. We'll go, all right?"

"THE COURT: Well, how do you intend to proceed on your own?

"THE DEFENDANT: What I believe is whatever they say and whatever I believe that it's not. I'm going to say things how it really happened and I would like to have myself say exactly what happened and I would not hold anything back to help my own case.

"THE COURT: There are, I think, three choices for you at this point given where we are, okay? You can have [counsel] represent you still, you can represent yourself which means you have to pick the jury. You have to follow our rules in doing that. You have to be able to examine any witness that the state puts on the stand, if you wish to do that.

"THE DEFENDANT: That's fine, your Honor.

"THE COURT: And alternatively, we can go back to the plan that I said this morning which allows you to maintain your not guilty plea and keep the peace and be of good behavior.

"THE DEFENDANT: I don't believe in that. I believe --

"THE COURT: Well, I can do it without your agreement.

"THE DEFENDANT: I haven't done anything wrong, your Honor. My house has been violated more than one time and this has got to stop.

"THE COURT: It would not be admitting you did anything wrong, just the opposite. It would be you saying I'm not guilty and the Court agreeing that you can maintain that belief.

"THE DEFENDANT: My problem there, your Honor, is the same way. If you said that I have to stay for one year, I don't have to go out to look for the trouble, they came to my home. They could do it again. This has been going on since I moved there. They want me to move out. I'm a homeowner. My husband died. I'm not going anywhere. I'm fifty-two years old. There, this is my problem. If I take your plea, they could come to my house and do anything. I am the only Spanish one there. There was other Spanish people, they made them move. The people that I bought the house from, they always were Spanish and they move and after I bought the house they told me the truth why they got rid of the house for the same problem I'm going through right now and they

- 7 -

want me out. They're going to come back and say anything that I have done, not doing anything. I cannot run away from this problem. I'm going to confront this problem. I have not done anything wrong. My kids are teachers.

"THE COURT: I understand.

"THE DEFENDANT: My kids are supervisors.

"THE COURT: Listen to me, Ms. Cruz. This is why I'm saying that you maintain your not guilty plea. That's why I don't do that in very many cases. It would allow you to say I'm not guilty. Yes, it would keep you on probation for a year. You don't want that?

"THE DEFENDANT: Your Honor, if I accept this, I have not done anything wrong. I will be on probation. Any officer could come back in my house and the same thing they have right now. Where does that leave me? Go to jail for not doing anything just because I bought a house in a white neighborhood? That's the only wrong thing I have done, move into the wrong area, that's all I have done. I have been working so many years in the community. Everybody loves me. I'm respectful. I'm always helping kids. Where does that put me? I could go to jail because they don't want me to be in the neighborhood. They don't want me there in my community because I'm Spanish. I have not been any trouble. I'm fifty-two years old.

"THE COURT: Why do you think you would be going to jail?

"THE DEFENDANT: Because they invented all things. They came in my home, okay, and they've been coming before this. They come to my house. They come inside my house, police officers. I have a complaint. They have come into my home every time I'm in the country with not me opening my door. They have coffee in my driveway. What does that call? There is no control instead of me moving out and I'm not going to move out. I bought that house. I work so hard in my life to have today what I have.

"THE COURT: Let's go back to your options. We're picking a jury. You wanted a jury. You wanted a trial.

"THE DEFENDANT: Yes.

"THE COURT: The only question is do you want to represent yourself? Do you want [counsel] to continue representing you?

"THE DEFENDANT: I will represent myself.

"THE COURT: And you understand that if something goes wrong during you representing yourself, I may have no choice but to suspend that trial. It's a difficult thing to represent yourself. I'm willing to let you do it. I've seen people do it before and do it successfully but you have to do that and play by the rules that apply in the courtroom.

"THE DEFENDANT: I will do it, your Honor.

"THE COURT: Do you want [counsel] to stand by so that if you need to talk to him, you can talk to him? If you have a question that you don't know what to do, you can ask him?

"THE DEFENDANT: As long as I say what really happened, it's fine, because he doesn't want me to say exactly what happened. He wants me to go along with everything. I don't believe in that. I believe in saying what happened. I don't care if they believe me or not.

"THE COURT: I have another suggestion, how about this: [counsel] continues to act as your lawyer, he helps you pick a jury, he makes an opening statement, if you want and he wants to, saying what your side of the story is. If he wants, he thinks that's an advisable thing, he can do that later. He can cross examine the officer on your behalf and then the time will come during this trial where you will have to make a decision whether you want to testify or not, okay. You can talk to [counsel] about that and I'll address both of you at that point.

"THE DEFENDANT: That's fine, your Honor.

"THE COURT: Does that work?

"THE DEFENDANT: (NONVERBAL RESPONSE).

"THE COURT: You sure?

"THE DEFENDANT: (NONVERBAL RESPONSE).

"THE COURT: Do you have confidence in him?

"THE DEFENDANT: No.

"THE COURT: Do you have enough confidence to handle the parts of the trial up to the point where you would testify? It's your decision whether you want to take the stand or not, it's your decision.

"THE DEFENDANT: I'll do it, your Honor.

"THE COURT: I don't want to make you do it. You can do it yourself, if you want. He can be here to assist, but I'm concerned that if you don't know the procedure this is going to get very complicated and we don't want that to happen because that can cause a trial not to be fair.

"THE DEFENDANT: I believe in God and he will be with me. I will do it on my own.

"THE COURT: You'll do everything on your own? Would you like [counsel] to stand by and assist you?

"THE DEFENDANT: No.

"THE COURT: You don't want him in the courtroom at all?

"THE DEFENDANT: I'm going to do it on my own.

"THE COURT: And how are you going to pick a jury?

"THE DEFENDANT: I'll just pick it up. It doesn't matter.

"THE COURT: I will do my best to assist you. I can't act as your lawyer, I can't. You know that wouldn't be fair, right? And you don't want him even in the courtroom in case you have a question that you can't resolve?

"THE DEFENDANT: I have God and he will lead me.

"THE COURT: The other problem I have is that he stood up and told this jury that he was your lawyer. Now I have to tell the jury you don't want him as your lawyer and that could hurt your case.

"THE DEFENDANT: That's okay.

"THE COURT: All right. You ready to go?

"THE DEFENDANT: (NONVERBAL RESPONSE).

"THE COURT: Are you sure?

"THE DEFENDANT: (NONVERBAL RESPONSE).

"THE COURT: [Counsel]?

"[COUNSEL]: Yes, Judge.

"THE COURT: I think the defendant does not want you to act as her attorney anymore.

"[COUNSEL]: That's her desire, Judge. I mean, I can't change her mind. I'm willing to sit here. If she doesn't want me here, I guess you have to let me go and what I'll do in the meantime while she's doing the jury is I'll make copies of everything. I don't know what good that is going do [sic] because she doesn't know how to read. I'll give copies prior to going back today. That's all I can do, Judge. I wouldn't mind staying here assisting her. If she doesn't want my assistance, I can't make her.

"THE COURT: Ms. Cruz, before I let [counsel] go, I need to be sure you don't want him here for any reason.

"THE DEFENDANT: I don't, your Honor."

After releasing her attorney, defendant continued without representation for the duration of the trial. After a two-day jury trial in Superior Court, the jury found defendant guilty of both resisting arrest and disorderly conduct. The defendant was sentenced to five months of probation for each count, ordered to run concurrently.[4] Subsequently, defendant filed a timely pro se notice of appeal on July 15, 2013. On appeal, defendant is now represented by counsel.

---

[4] According to defendant, she successfully completed her probation in November 2013.

## Standard of Review

"With respect to a trial justice's determination as to whether or not a criminal defendant's waiver of his or her Sixth Amendment right to counsel is knowing, voluntary, and intelligent," this Court reviews this constitutional inquiry de novo. State v. Sampson, 24 A.3d 1131, 1139 (R.I. 2011); see also State v. Brumfield, 900 A.2d 1151, 1153 (R.I. 2006); State v. Laurence, 848 A.2d 238, 253 (R.I. 2004); State v. Thornton, 800 A.2d 1016, 1026 (R.I. 2002). Nevertheless, "[e]ven when the de novo standard is applied to issues of constitutional dimension, we still accord a hearing justice's findings of historical fact, and inferences drawn from those facts, great deference in conducting our review." State v. Eddy, 68 A.3d 1089, 1098 (R.I. 2013) (quoting Thornton v. State, 948 A.2d 312, 316 (R.I. 2008)).

## III

## Discussion

On appeal, defendant argues that her Sixth Amendment right to counsel was violated because the trial justice permitted her to represent herself without first determining whether she had made a constitutionally valid, knowing and intelligent waiver of counsel. In particular, defendant contends that the trial justice failed to determine whether she "understood the dangers and disadvantages of self-representation * * *." The state argues that defendant made a voluntary waiver of her right to counsel and "that she appreciated the risks in so doing[] * * *." Additionally, the state asserts that the colloquies at trial demonstrate that defendant's waiver of counsel was constitutionally valid in that it was "knowing and informed."

The Sixth Amendment to the United States Constitution and article 1, section 10 of the Rhode Island Constitution afford an accused the right to the assistance of counsel in all criminal

prosecutions. See Laurence, 848 A.2d at 252. "Whether defense counsel is retained or appointed, this right ensures that the trial is fair." Id. A criminal defendant also has the right to proceed pro se at trial representing himself or herself, provided that his or her waiver of counsel is valid. E.g., State v. Spencer, 783 A.2d 413, 416 (R.I. 2001); State v. Chabot, 682 A.2d 1377, 1379-80 (R.I. 1996); see also Faretta v. California, 422 U.S. 806, 819 (1975) ("The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his [or her] defense."). In order for a waiver to be valid, a defendant must waive his or her right to counsel voluntarily, knowingly, and intelligently. State v. Bluitt, 850 A.2d 83, 88 (R.I. 2004); see also Iowa v. Tovar, 541 U.S. 77, 88 (2004). When confronted with a defendant's purported waiver of counsel, this Court employs a two-prong analysis to determine the validity of that waiver. Laurence, 848 A.2d at 253. It is well settled that we must first determine whether the waiver was "voluntary," and then we must determine whether the waiver was "knowing and intelligent." Id. (quoting Thornton, 800 A.2d at 1025); see also Bluitt, 850 A.2d at 87.

In conducting this constitutional inquiry, this Court examines the totality of the circumstances. Chabot, 682 A.2d at 1379-80. A valid waiver is effective only if a "defendant 'knows what he [or she] is doing and his [or her] choice is made with eyes open.'" Id. at 1380 (emphasis omitted) (quoting Faretta, 422 U.S. at 835). A criminal defendant, therefore, should be "made aware of the dangers and disadvantages of self-representation." Id. (quoting Faretta, 422 U.S. at 835). To that end, the presence of a detailed colloquy between a trial justice and a defendant on the record assists the trial justice in ascertaining the knowing and intelligent nature of a defendant's waiver. See Spencer, 783 A.2d at 416. However, this Court has recognized that "such an inquiry is not constitutionally required." Id.; see also Thornton, 800 A.2d at 1026.

Instead, "[w]e are persuaded that an examination of the totality of the circumstances, in light of the particular stage of the proceedings at the time the waiver is proposed, is the better approach to determine whether a waiver of counsel is knowing, voluntary and intelligent." Thornton, 800 A.2d at 1027 (quoting Spencer, 783 A.2d at 417). Moreover, a trial justice "need not make any assessment of the extent of the defendant's technical legal knowledge in determining the defendant's knowing exercise of the right to defend himself." State v. Briggs, 787 A.2d 479, 485 (R.I. 2001) (quoting State v. Costa, 604 A.2d 329, 330 (R.I. 1992)).

In Chabot, 682 A.2d at 1380, we elucidated six factors (Chabot factors) to aid trial justices in assessing the validity of a waiver of counsel when the competence of a defendant is in question at the time of the ostensible waiver. These factors include:

> "(1) the background, the experience, and the conduct of the defendant at the hearing, including his age, his education, and his physical and mental health; (2) the extent to which the defendant has had prior contact with lawyers before the hearing; (3) the defendant's knowledge of the nature of the proceeding and the sentence that may potentially be []imposed; (4) the question of whether standby counsel has been appointed and the extent to which he or she has aided the defendant before or at the hearing; (5) the question of whether the waiver of counsel was the result of mistreatment or coercion; and (6) the question of whether the defendant is trying to manipulate the events of the hearing." Id.

This Court has articulated that the application of these factors by a trial justice is mandatory only when the mental competency[5] of a defendant is at issue. Laurence, 848 A.2d at 254. Moreover,

---

[5] The Supreme Court has recognized that there is no meaningful distinction between the competency of a defendant to stand trial and the competency of a defendant to waive counsel. Godinez v. Moran, 509 U.S. 387, 399 (1993). In Godinez, the Supreme Court stated:
> "Nor do we think that a defendant who waives his [or her] right to the assistance of counsel must be more competent than a defendant who does not, since there is no reason to believe that the decision to waive counsel requires an appreciably higher level of

- 14 -

we recommend, but do not require, the consideration of the <u>Chabot</u> factors under a trial justice's analysis of the totality of circumstances even in cases in which a defendant is considered competent. <u>Laurence</u>, 848 A.2d at 253-54; <u>Briggs</u>, 787 A.2d at 486 ("While not mandatory, the factors set forth in <u>Chabot</u> may be used as a guide in determining a valid waiver of counsel."); see <u>Spencer</u>, 783 A.2d at 417.

We first consider the voluntariness of defendant's waiver of counsel. On appeal, defendant's arguments appear to focus on the second prong of our waiver analysis, alleging a constitutional deficiency in the knowing and intelligent nature of her waiver. Nevertheless, we briefly examine whether defendant waived her right to counsel voluntarily. On the heels of her request to release counsel, defendant plainly conveyed to the trial justice, "I will represent myself." As this Court has previously recognized, "[i]t is generally acknowledged that absent any showing of 'good cause' for a defendant's refusal to accept court-appointed counsel, such refusal is functionally equivalent to a voluntary waiver of the right to counsel." <u>Laurence</u>, 848 A.2d at 253 (quoting <u>Thornton</u>, 800 A.2d at 1025). Moreover, on the record before us, the

mental functioning than the decision to waive other constitutional rights." <u>Id.</u>
Nevertheless, the Supreme Court did establish that states may "adopt competency standards that are more elaborate than the [<u>Dusky v. United States</u>, 362 U.S. 402 (1960),] formulation * * *." <u>Godinez</u>, 509 U.S. at 396, 402 ("In [<u>Dusky</u>], we held that the standard for competence to stand trial is whether the defendant has a 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has 'a rational as well as factual understanding of the proceedings against him.'"). Under this Court's precedent, "[w]e previously have determined that a defendant is subjected to a heightened standard of competency when he [or she] attempts to waive counsel and appear <u>pro</u> <u>se</u>." <u>State v. Thomas</u>, 794 A.2d 990, 994 (R.I. 2002). This heightened standard requires the application of the <u>Chabot</u> factors when a defendant's mental competency is in question at the time of the waiver, in order to determine whether a defendant is making a voluntary, knowing, and intelligent waiver. <u>State v. Chabot</u>, 682 A.2d 1377, 1380 (R.I. 1996). In the present case, no suggestion was made either at trial or on appeal that defendant was not competent to stand trial. This opinion is confined to the facts of this case and the only issue on appeal, which is whether defendant's waiver of counsel was constitutionally valid.

lengthy colloquies between the trial justice and defendant establish that defendant's decision—to waive counsel and proceed pro se at trial—was a product of her own free will. For these reasons, we are satisfied that defendant's waiver of counsel was voluntary.

Next, we consider whether defendant's waiver of counsel was knowingly and intelligently executed. The trial justice engaged in an extended colloquy with defendant, during which she had the benefit of seeing and hearing defendant firsthand, to augment defendant's rationale and responses now on the record before us. The defendant's conduct throughout that colloquy demonstrated her dissatisfaction with her counsel and her belief that "[she] could do it better [her]self." Accordingly, the trial justice inquired whether defendant knew how to represent herself at trial. In response, defendant informed the trial justice that she was unable to read or write and did not know how to represent herself, but nevertheless she made it clear that it was her intent to proceed pro se. Over the course of the colloquy, the trial justice endeavored to, and in our opinion did, make defendant "aware of the dangers and disadvantages of self-representation." Chabot, 682 A.2d at 1380 (quoting Faretta, 422 U.S. at 835). In particular, the trial justice explained the potential difficulties of self-representation given the complex rules of the courtroom, which the trial justice made clear she would require defendant to follow. Furthermore, the trial justice expressed her concerns that defendant's lack of knowledge of law and trial procedure "c[ould] cause a trial not to be fair." Despite the trial justice's repeated admonitions, defendant remained firm in her choice to represent herself without any assistance of counsel.

In exploring defendant's options moving forward, the trial justice did revisit her offer of a not-guilty filing provided defendant "keep the peace and be of good behavior." In response, defendant again explained the rationale behind her refusal to accept the not-guilty filing, which

demonstrated her reasonable apprehension and concern based on her previous interactions with police and her neighbors. When she initially rejected the trial justice's offer of a not-guilty filing, defendant explained: "I came from the Dominican Republic. I have an organization. I help a lot of kids to keep them off the street, teach them about their rights, the same way I'm going through right now and I'm innocent and if I decide to take this, I will not live with myself at all." The defendant's introspection evidences her grasp of the circumstances before her, as well as the potential perils beyond her control associated with the not-guilty filing. Later in the colloquy, when defendant did not appear amenable to any option besides proceeding pro se, the trial justice presented the option of having her attorney serve as standby counsel.

Although the trial justice engaged in a colloquy with defendant, she did not explicitly apply the Chabot factors. Nevertheless, even though the factors remain relevant, this Court has consistently stated that a trial justice is required only to employ the Chabot factors when there are questions regarding the mental competency of a defendant. See, e.g., Thornton, 800 A.2d at 1027; Briggs, 787 A.2d at 486; Spencer, 783 A.2d at 416-17. Now, on appeal, the argument that defendant advances suggests that, as the trial progressed, her conduct brought to light questions concerning her mental competency. She contends that the trial justice erred in not probing more deeply into her mental health because "red flags were waving for Chabot's application in this matter since there were legitimate doubts about most of the Chabot factors."[6] A self-represented litigant's performance at trial, however, does not inform the knowing and intelligent nature of his or her original waiver of counsel. Rather, the relevant time frame for assessing the validity of a

---

[6] "In Chabot, this Court held that if a defendant waives his [or her] right to counsel and, in doing so, creates a legitimate doubt about his [or her] mental condition, then 'it [is] incumbent upon the trial justice to conduct a more searching inquiry of [the] defendant's then existing mental health and physical condition[.]'" Rose v. State, 994 A.2d 662, 664 (R.I. 2010) (mem.) (quoting Chabot, 682 A.2d at 1380).

defendant's waiver of counsel and, similarly, questions regarding her competency to do so, is at the time of the waiver. See Rose v. State, 994 A.2d 662, 664 (R.I. 2010) (mem.); State v. Holdsworth, 798 A.2d 917, 923 (R.I. 2002). In this case, the record is devoid of any concern raised in the colloquy between the trial justice and defendant, or by her former counsel, as to her mental competency. Thus, considering the facts before the trial justice at the time of defendant's waiver, it is unlikely that they gave rise to "legitimate doubts about * * * defendant's mental condition." Chabot, 682 A.2d at 1380.

Moreover, the trial justice had no circumstances before her to suggest that defendant was presently affected by or had a history of any psychiatric diagnosis or treatment. See Rose, 994 A.2d at 664-65, 665 n.6 (noting that there was no evidence in the record to alert the hearing justice to the defendant having any potential mental disability that warranted the application of the Chabot factors). As such, the facts of this case are distinct from those in Chabot, 682 A.2d at 1380, where the trial justice knew that the defendant had been a patient and had been prescribed medication in a psychiatric care unit for five months before the probation-revocation hearing. In that case, we held that the defendant's waiver of counsel was not valid because a more thorough inquiry, involving the Chabot factors, was necessary based on those facts. Id. at 1380-81. Similarly, in Holdsworth, 798 A.2d at 924, the trial justice was aware that the defendant had previously been a patient at a mental health facility. In light of that fact, this Court determined that the defendant's waiver of counsel was not valid because the trial justice had not applied the Chabot factors. Id. at 924-25.

At the time of defendant's waiver of counsel, the record before us, however, does not present analogous facts. Therefore, although an explicit Chabot discussion would have been preferable, the absence of such a colloquy does not infect defendant's waiver of counsel with any

constitutional defect. As our review is confined to the written record, we emphasize the fact that the trial justice, who had the benefit of seeing and hearing defendant firsthand, made the decision that application of the <u>Chabot</u> factors was not necessary.[7] Moreover, much of the information that a <u>Chabot</u> analysis is intended to mine was unearthed during the colloquy between the trial justice and defendant. It was revealed that defendant was at the time a fifty-two-year-old widow who owned her own home; her children were teachers and she was involved in the community, particularly with "kids." She acknowledged that she could not read or write, but she answered the trial justice's questions and at all times was respectful to the court. Not only was defendant represented by counsel during all preliminary proceedings in Superior Court, she was also represented by counsel throughout her trial and conviction in the District Court. Further, there is absolutely no indication that she was trying to manipulate the proceedings or that her waiver was the result of mistreatment or coercion. On the contrary, defendant resolutely maintained her desire to waive counsel and proceed on her own behalf before the court.

Also, defendant repeatedly expressed her unwillingness to accept a one-year not-guilty filing of the charges, realizing that the charges would not disappear during that year. She explained that she lived in a predominantly white neighborhood, which she described as "the wrong neighborhood," and she expressed a distrust of both her neighbors and the police because she is "Spanish." She indicated that this incident was not the first time the police had come into her house without an invitation. She maintained her innocence and clearly did not want these charges hanging over her head for another year. Rather, she wanted them resolved by a jury

---

[7] See <u>Commonwealth v. Simpson</u>, 704 N.E.2d 1131, 1136 (Mass. 1999) (addressing the issue of the defendant's competency to stand trial and noting that "[t]he [trial] judge, unlike appellate judges, had the advantage of seeing and hearing the defendant."); <u>Commonwealth v. DeMinico</u>, 557 N.E.2d 744, 748 (Mass. 1990) (same).

trial. We cannot conclude that, as defendant argues on appeal, the very fact that she rejected a not-guilty filing "was not a rational decision."

We next turn to address defendant's appellate argument that chronicles her many deficiencies in self-representation at trial to bolster her contention that the Chabot factors should have been applied. The Supreme Court has established that "the competence that is required of a defendant seeking to waive h[er] right to counsel is the competence to waive the right, not the competence to represent h[er]self." Godinez v. Moran, 509 U.S. 387, 399 (1993). "Thus, while '[i]t is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts,' * * * a criminal defendant's ability to represent h[er]self has no bearing upon h[er] competence to choose self-representation." Id. at 400 (quoting Faretta, 422 U.S. at 834).

Further, the Supreme Court, as well as this Court, has made clear that "technical legal knowledge" is not relevant to whether a defendant made a knowing and intelligent waiver of counsel. See, e.g., Faretta, 422 U.S. at 836; Sampson, 24 A.3d at 1143; Costa, 604 A.2d at 330. Consequently, we do not consider defendant's missteps at trial due—at least in large part—to her lack of knowledge of law and trial procedure as part of the knowing and intelligent inquiry in our waiver validity analysis. Moreover, we echo one of the Supreme Court's fundamental teachings on the right of self-representation that, "although [defendant] may conduct h[er] own defense ultimately to h[er] own detriment, h[er] choice must be honored out of 'that respect for the individual which is the lifeblood of the law.'" Faretta, 422 U.S. at 834 (quoting Illinois v. Allen, 397 U.S. 337, 350-51 (1970) (Brennan, J., concurring)).

Although it would have been preferable for the trial justice to specifically address some of the pertinent Chabot factors, we are not persuaded that such an inquiry would have produced

any evidence to suggest that defendant's waiver of counsel was not knowing and intelligent. See Spencer, 783 A.2d at 417-18.  Accordingly, in light of the particular stage of the proceedings, the facts before the trial justice at the time of waiver, and the trial justice having the benefit of seeing and hearing defendant, we believe that the trial justice engaged in a pragmatic colloquy sufficient to establish the validity of defendant's waiver. See id.

After careful consideration of the totality of the circumstances at the time of the defendant's waiver, we conclude that the record establishes the defendant's voluntary, knowing, and intelligent waiver of her right to counsel.  The defendant made her choice—eyes wide open—to waive counsel and represent herself at trial.

# IV

## Conclusion

For the reasons stated herein, the judgment of the Superior Court is affirmed.  The record of this case shall be returned to the Superior Court.



# RHODE ISLAND SUPREME COURT CLERK'S OFFICE

## *Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**        State v. Ana M. Cruz.

**CASE NO:**        No. 2013-282-C.A.
                                (P3/12-3306A)

**COURT:**        Supreme Court

**DATE OPINION FILED:**   February 11, 2015

**JUSTICES:**        Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**        Chief Justice Paul A. Suttell

**SOURCE OF APPEAL:**   Providence County Superior Court

**JUDGE FROM LOWER COURT**:

                      Associate Justice Judith C. Savage

**ATTORNEYS ON APPEAL:**

                      For State:  Aaron L. Weisman
                              Department of Attorney General

                      For Defendant:  Catherine Gibran
                                  Office of the Public Defender