June 24, 2021

**Supreme Court**

No. 2018-144-C.A.

(P1/17-1236AG)

State               :

v.                :

Joseph Segrain.       :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                              :

v.                              :

Joseph Segrain.                      :

Present:  Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

## O P I N I O N

**Justice Robinson, for the Court.**  This case is replete with complexities that necessitate a relatively lengthy factual narrative on our part.  In the end, however, our focus will of course be on the legal issues implicated by the appeal of the defendant, Joseph Segrain.  The defendant appeals from a March 29, 2018 judgment of conviction and commitment entered in the Providence County Superior Court, reflecting the fact that he was found guilty by a jury on five counts related to conduct stemming from a drive-by shooting.[1]  On appeal, the defendant

---

[1]     The defendant was also convicted of one other count (*viz.*, Count Seven) stemming from the same conduct; but, pursuant to a stipulation, that count was not decided by the jury, but by the trial justice, who found defendant guilty.  *See* footnote 3, *infra*.

- 1 -

contends that the trial justice[2] erred by: (1) granting the first mistrial, thereby allegedly violating his constitutional right against being put in double jeopardy; (2) denying his motion to suppress a particular eyewitness identification; (3) denying his motion to recuse; (4) denying his right to represent himself at trial and at the sentencing hearing; and (5) allowing certain videos and testimony to be admitted into evidence.

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

## Facts and Travel

The instant case arises out of what can best be characterized as a feud involving members of two rival gangs based in Pawtucket—one called "Bucket East" and the other "Bucket West." That feud ultimately led to a drive-by shooting on January 9, 2017, which resulted in a number of criminal charges being lodged against defendant. The relevant facts as to what transpired on that date will be set forth in detail when we relate the witness testimony that is part of the voluminous record in this case.

---

[2]    Since the same justice of the Superior Court was involved in all phases of this case, we shall refer to him throughout this opinion as "the trial justice" without variously referring to him as "the hearing justice" or "the sentencing justice."

On May 10, 2017, defendant was indicted by a grand jury on the following counts: assault with a dangerous weapon (Count One); discharge of a firearm during a crime of violence (Count Two); conspiracy to commit a felony (Count Three); unlawful possession of a firearm (Count Four); unlawful possession of a firearm (Count Five); discharge of a firearm from a motor vehicle (Count Six); and unlawful possession of a firearm by an individual having previously been convicted of a crime of violence (Count Seven).[3]

## A

### Pretrial Motions

Before the eventual criminal trial of defendant took place, the trial justice heard pretrial motions with respect to a number of issues, the rulings on all but one of which motions have not been challenged on appeal. Accordingly, we need only focus on the pretrial hearing relative to defendant's motion to suppress a particular eyewitness identification.

Geovanni Perez, a parking attendant, testified at the pretrial hearing (and later at trial). Mr. Perez testified that, on January 9, 2017, he was employed as a valet at the Hope Club, which is located on the corner of Benefit Street and Benevolent Street in Providence, and where an event was scheduled for noon. He

---

[3] Count Five was eventually dismissed by the trial justice as being identical to Count Four. Count Seven was not presented to the jury; instead, pursuant to a stipulation, it was decided by the trial justice. *See* footnote 1, *supra*.

stated that, when he arrived in the vicinity of the Hope Club, he parked his car on Benevolent Street toward the top of the hill. He said that, while he was walking down Benevolent Street towards the Hope Club, he was interrupted by a man sitting in the driver's seat of a "black" "BMW X5 SUV," who lowered his window and asked him if one was permitted to park on that street. Mr. Perez added that, during this interaction, he was standing on the driver's side of the car, roughly one foot away from the driver.

Mr. Perez also testified that, at some point thereafter, people began to arrive for the scheduled event at the Hope Club and that, because there were so many cars trying to park, traffic was overflowing onto Benefit Street (which runs perpendicular to Benevolent Street).[4] He stated that he then once again saw the man with whom he had spoken earlier and that the man was still driving the BMW and was attempting to get around the traffic. Mr. Perez testified that, when the car tried to "come up" Benevolent Street, he approached the driver and helped him "back out" onto, and proceed down, Benefit Street. He added that, while doing so, he made eye contact with the man.

---

[4]     In order to assist the reader unfamiliar with the city streets of Providence in visualizing the events that are summarized in this opinion, we would indicate that Benevolent Street is a relatively small street, which runs in a roughly East-West direction and is on a hill. Benefit Street is a lengthy street in the historic section of Providence; it runs in a roughly North-South direction. The Providence County Courthouse is located on Benefit Street, and it is not far from Benevolent Street.

Mr. Perez proceeded to testify at the hearing that, on January 19, 2017 (ten days after his encounters with the driver of the BMW near the Hope Club), he spoke with detectives from the Providence Police Department about his above-described interactions with the driver of the BMW. He stated that the detectives first showed him a single photograph of a car (in which there was a driver), which car he identified as the car that he had twice seen near the Hope Club on January 9. Mr. Perez added that, following his identification of the vehicle, the detectives had him participate in a photographic lineup by displaying a series of photographs sequentially. He testified that, when he saw the second photograph in the sequential display, he told the detectives that it was a photograph of the man with whom he had spoken on January 9.

After he had testified at the suppression hearing with respect to his January 19 out-of-court identification of defendant in the presence of the detectives, Mr. Perez proceeded next to make an in-court identification of defendant as being the individual whom he had spoken to and seen driving the BMW on January 9.

The trial justice ultimately denied defendant's motion to suppress Mr. Perez's identification, and Mr. Perez was thereafter permitted to testify at trial.

# B

## The First Aborted Trial

The defendant's first trial commenced on January 2, 2018. The first witness to testify was Attorney Lauren Balkcom. She testified on direct examination about what occurred in and around Courtroom 10 of the Superior Court on January 9, 2017. While being cross-examined by defense counsel and while attempting to seek clarification of a question posed to her by counsel, she made reference to "the violation hearing * * *."[5] Immediately following that mention of "the violation hearing," defense counsel requested a sidebar conference with the trial justice. At that conference, defense counsel moved for a mistrial on the ground that Attorney Balkcom's reference to a prior judicial proceeding involving defendant ("the violation hearing") prejudiced defendant in the eyes of the jury. After hearing arguments from counsel, the trial justice denied the motion for a mistrial, finding that the reference to the violation hearing was not a "purposeful remark on [Attorney Balkcom's] part to try and derail this train." Nonetheless, the trial justice gave a cautionary instruction to the jury, which included the following statement (characterized by the trial justice as "a civil untruth"): "There was no

---

[5]     Solely for the purpose of contextualizing Attorney Balkcom's reference to "the violation hearing," we note that, several months before defendant's actual criminal trial, he was the subject of a probation violation hearing that addressed whether his alleged conduct on January 9, 2017 had violated the terms and conditions of a probationary sentence he had previously received. *See State v. Segrain*, 243 A.3d 1055, 1056-57 (R.I. 2021).

violation type of proceeding prior to this trial. The witness misspoke herself." The trial justice added: "That is to say, the proceedings before this Court."

The trial then resumed. However, partway through the testimony of the second witness for the state, the trial justice revisited the issue of the motion for a mistrial. He stated that, although he had told the jury "a civil untruth," he considered the jury to be a "smart group," and he said that he was not sure "[w]hether they buy [the civil untruth] or not * * *." Ultimately, the trial justice opted to grant the mistrial. The defendant did not immediately move for dismissal of the indictment on double jeopardy grounds. *See, e.g.*, *State v. Casas*, 792 A.2d 737, 738 (R.I. 2002).

## C

### The Second Aborted Trial

The defendant's second trial began on January 10, 2018. Before jury impanelment commenced, defendant asked to address the trial justice. In the midst of the trial justice's admonition to defendant that he would not permit "hybrid counsel,"[6] defendant interrupted to complain about what he claimed to be "the violation of [his] rights" under the Fourteenth Amendment. The defendant specifically stated that his rights were violated because the trial justice was

---

[6] This Court has stated that a "criminal defendant has no right to hybrid representation, whereby some tasks are performed by counsel and others by the defendant on a *pro se* basis." *State v. Connery*, 139 A.3d 401, 403 n.4 (R.I. 2016) (quoting *State v. Oliveira*, 127 A.3d 65, 80 (R.I. 2015)).

"supposed to call th[e] mistrial immediately, and * * * didn't" and because the trial justice had "lied" when he "gave the jurors the wrong instructions." The trial justice did not respond to defendant's comments and instead directed the sheriffs to bring the jury into the courtroom. Before the jury entered, however, defendant refused to let the sheriffs remove his leg restraints, and he complained about being "sprayed and tasered" by the sheriffs. When defendant finally permitted the sheriffs to remove his leg restraints, jury *voir dire* began.

On January 16, 2018, the third day of defendant's second trial, while the jury was still being impaneled, defendant again asked to address the court directly because he "ha[d] a couple of issues that [he] would like to bring up * * *." Specifically, and for the first time, defendant raised the issue of the double jeopardy provision in the Fifth Amendment to the United States Constitution,[7] stating that it "affords a criminal defendant a valued right to have his trial completed by a particular tribunal, which the first one was tainted, not because of me." He further added that he wanted to "stop[] these proceedings" because he "never consented to a mistrial."

---

[7] "The Fifth Amendment to the United States Constitution (made applicable to the states through the Fourteenth Amendment) * * * protect[s] a defendant from being prosecuted more than once for the same offense." *State v. O'Connor*, 936 A.2d 216, 220 n.4 (R.I. 2007). The Fifth Amendment provides in pertinent part: "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb[.]" *Id.* (internal quotation marks omitted).

In a response spanning thirteen transcript pages, the trial justice outlined the ways whereby he had attempted to protect defendant's rights—which included his having given the jury a cautionary instruction and having granted the mistrial motion with respect to the first trial. After the trial justice completed his remarks and attempted to let the impanelment process continue, defendant stated that, for the remainder of the trial, he planned to proceed *pro se* and that defense counsel would thereafter act as standby counsel. The trial justice warned defendant that "[r]epresenting oneself is very chancy and not a very smart move," to which defendant responded:

> "It's definitely not hard. I did all this myself. I didn't ask [defense counsel] to help me. Every motion that was put in, I told her to put it in. *Franks* hearing, I told her to do it. That was me. That wasn't [defense counsel]. So it's not hard. I can comprehend everything. I got a *Black's Law Dictionary*. I have the same books you have. It's not hard. I can pull over the law, too.
>
> "* * *
>
> "* * * I just need a couple of days to go over my paperwork, and I'll represent myself. It's not hard."

With respect to defendant's request for a continuance of "a couple of days," the trial justice stated that, because defendant had "spr[u]ng this on [him] at the last minute" and because there was "a jury upstairs that [they had] begun to impanel" and "other new jurors that [they were] going to use to finish the impanelment," he would not grant a continuance. The defendant continued to directly address the

- 9 -

court by making a motion to dismiss the case and a "motion to suppress" the entirety of Attorney Balkcom's testimony from the first trial; he also asked for the opportunity to review the transcript of the sidebar conference during the first trial regarding the motion for a mistrial. After denying each of these motions, the trial justice permitted defendant to proceed *pro se*, with defense counsel acting as standby counsel.

On two more occasions that same day, the trial justice revisited the issue of defendant's decision to represent himself, reiterating the point that "firing a lawyer and waiving your right to counsel are very serious things." Notably, after jury impanelment had concluded (but before the jury was sworn), the following colloquy ensued:

> "THE DEFENDANT: I never indicated I wanted to go pro se.
>
> "THE COURT: Yes, you did.
>
> "THE DEFENDANT: Yeah. I'm being forced to go pro se because you won't let me get another attorney. Don't say I made that decision.
>
> "THE COURT: Don't you raise your voice to me.
>
> "THE DEFENDANT: I'm not raising my voice. I'm talking to you.
>
> "THE COURT: Yes, you are.
>
> "THE DEFENDANT: That's the way I talk. I apologize if I'm loud. That's the way I talk.

"THE COURT: Well, you better modulate your tongue from now on.

"THE DEFENDANT: All right. Then you do the same.

"THE COURT: I'm holding you in contempt. This jury will be sent home. It will not be sworn. Six months. And I would suggest and recommend that it will be [in] administrative segregation."

On January 18, 2018, two days after the colloquy that ended with defendant being held in contempt, he appeared again before the trial justice. At that point, defense counsel informed the trial justice that defendant had again engaged her as his attorney, and she added that defendant had "something that he would like to say to the [c]ourt * * *." The trial justice reviewed with defendant the ramifications of separating from counsel and confirmed that defendant was prepared to move forward with defense counsel representing him. He permitted defendant to directly address the court, at which point defendant apologized for his conduct earlier that week. Defense counsel then asked that the trial justice purge the finding of contempt in light of defendant's "acknowledge[ment] [of] the error of his ways * * *." The trial justice responded as follows:

"THE COURT: You know, Mr. Segrain, this is the second time you have offered to me an apology for conduct that one could easily view as contumacious and insolent in the courtroom. You gave the sheriffs a hard time, you uttered vulgarities, the likes of which are at the furthest pole that one could imagine. Vulgarities were directed at the [c]ourt. You were argumentative. You

- 11 -

interrupted. You raised your voice. One does not easily forgive or forget when a defendant says to the [c]ourt, 'F*** you.' But let's start fresh. Okay?

"THE DEFENDANT: Yes, Your Honor.

"THE COURT: Out of respect to [defense counsel's] efforts on your behalf, and her long-standing representation of the clients in this courthouse over the years, okay, I'll purge the contempt."

Following this colloquy, the trial justice questioned whether defendant wished to proceed with the jury that had been impaneled or whether he wanted to "start fresh" the following week. Defense counsel, after conferring with defendant, informed the trial justice of defendant's wish that an entirely new trial take place.[8] At this point, the panel was excused, but jeopardy had not attached.

## D

### The Actual Trial

### 1. The Motion to Recuse

On January 22, 2018, another trial commenced—and, this time, it would proceed to a verdict and sentencing. Before jury *voir dire* began, defense counsel, at defendant's request, moved to recuse the trial justice. In making that motion,

---

[8] We would note that, because defendant began representing himself halfway through jury impanelment, defense counsel conducted part of the *voir dire* and defendant thereafter completed the process. In granting the mistrial motion, the trial justice stated that he wanted to "protect [defendant] from any kind of adverse impression that the present jury might draw if we were to go forward as it has been conscripted, first with [defense counsel], then with you, then with [defense counsel] again * * *."

- 12 -

defense counsel stated: "My client feels that the [c]ourt's decisions on the motions that have thus far been addressed in this case reflect a prejudice on the part of the [c]ourt against him, and he is asking that this case be transferred to another judge for trial." After hearing the state's response, the trial justice denied the motion. In rendering his decision, the trial justice stated: "The party seeking recusal bears the burden of establishing that the judicial officer possesses a personal bias or prejudice by reason of a preconceived or settled opinion of a characteristic calculated to impair his impartiality seriously and to sway his judgment." He further stated: "The defendant has not only completely failed to make any such showing, he has offered no grounds whatsoever." Accordingly, the trial justice continued presiding over the trial.

The case was ultimately heard by a jury on various dates in January and February of 2018. We relate below the salient aspects of what transpired at that trial.

## 2. The Testimony of Various Witnesses

There follows the testimony of those witnesses whose testimony we deem relevant to our resolution of the issues on appeal.

### i. The Testimony of Brandon Bates

Brandon Bates, a member of the Bucket East gang, testified that, on January 9, 2017, he drove one John Laboy, also a member of that gang, to the Providence

County Courthouse, where Mr. Laboy had a scheduled court appearance. Mr. Bates further testified that he accompanied Mr. Laboy to court because "supposably [*sic*] some people we had issues with were supposed to be in the courtroom that day." Mr. Bates stated that, when he and Mr. Laboy arrived at their destination, he parked on College Street[9] behind what he recognized as defendant's BMW. He further stated that, upon arriving at the courthouse, he and Mr. Laboy were joined by eight or nine other members of the Bucket East gang. Mr. Bates added that, after entering the courthouse, he remained by the courtroom door, while some other members of the group, including defendant, proceeded into the courtroom. He stated that, at some point thereafter, members of the group were escorted outside by courthouse security. Mr. Bates testified that, about ten or fifteen minutes later, the group walked toward the parked cars; he added that defendant got into the driver's seat of the BMW.

### ii. The Testimony of Attorney Lauren Balkcom

Attorney Lauren Balkcom also testified about the events of January 9, 2017. She began by stating that, on that date, she was on the fifth floor of the Providence

---

[9] The record reflects that several of the witnesses at trial referred to the street on which defendant and other members of the Bucket East gang had parked their vehicles as "College Hill." However, it is clear from Mr. Bates's testimony and the record as a whole that all references to "College Hill" actually relate to "College Street," which street is located adjacent to the Providence County Courthouse; and we shall hereinafter use the latter designation.

County Courthouse[10] representing one Carlos Depina[11] on a matter unrelated to the instant case. Attorney Balkcom testified that Carlos Depina was accompanied by three friends and family members, including Mathew Depina (the eventual victim of the drive-by shooting at issue in this case); she added that Carlos Depina and his three companions were seated in the back row of the courtroom. Attorney Balkcom further testified that she was sitting in the back of the courtroom speaking with Carlos Depina (her client) when defendant and several other individuals entered the courtroom; she added that defendant sat between Carlos Depina and one of his companions. Attorney Balkcom stated that she briefly spoke to defendant and asked him to relocate to another place in the courtroom so that she could continue her conversation with her client in private. She testified that defendant directed a vulgarity at her before he left the courtroom accompanied by other individuals. Attorney Balkcom stated that she followed defendant and the other individuals into the hallway, where she "spoke with the head of security * * * and a sheriff * * *."

---

[10] A person entering or leaving the fifth floor of the Providence County Courthouse would use the Benefit Street entrance.

[11] Mathew Depina testified that he knew Carlos Depina to be a member of the Bucket West gang.

Attorney Balkcom further testified that, when she returned to the courtroom, Carlos Depina and his companions were watching a Facebook Live[12] video on a cellular phone. She stated that the video showed a group of individuals standing outside on the courthouse steps directing vulgarities at her and at Carlos Depina and other members of the Bucket West gang. Attorney Balkcom said that, after viewing the video, she walked over to the courtroom window, from where she saw the same group of individuals walking up College Street and then entering their vehicles and driving down the street. Attorney Balkcom further stated that she photographed the vehicles, as she was able to see them from the courtroom window as they were driving. She added that she recognized the individual driving the first vehicle, a BMW, as defendant.

Attorney Balkcom testified that, at some point thereafter, Carlos Depina and his companions left the courthouse. She added that, after they left, she went down to the first floor of the courthouse,[13] from which location she observed Dana Smith, the official in charge of security operations for the Superior Court, running

---

[12]  Facebook Live is a feature of Facebook, an online social networking platform, that allows users to "[g]o live on Facebook to broadcast a conversation, performance, Q&A or virtual event." *See* https://www.facebook.com/formedia/solutions/facebook-live (last visited June 22, 2021).

[13]  The first floor of the courthouse faces South Main Street, a major street that runs in a North-South direction.

toward the Crawford Street Bridge.[14]  Attorney Balkcom testified that she followed Mr. Smith across South Main Street and that, when she was closer to the bridge, she "observed a white four-door sedan crashed on the bridge" and "Mr. Mathew Depina being put into an ambulance."  She stated that the white vehicle belonged to Mathew Depina.

### iii. The Testimony of Dana Smith

Dana Smith, the above-referenced security official, provided further testimony about the events of January 9.  Mr. Smith stated that he was standing outside of Courtroom 10 when he observed several men—including defendant and Mr. Laboy—exit that courtroom.  He testified that, when he spoke to those individuals soon thereafter, he told them that they should not re-enter the courtroom.  He added that he later told them—and others who had joined them—to leave the courthouse entirely.  Mr. Smith stated that all of the individuals to whom he had spoken, with the exception of defendant, left the building.  He said that defendant remained in the building, but went downstairs, asserting that "he had some other business * * * elsewhere in the courthouse * * *."  Mr. Smith testified that, although the group of individuals had exited the building, they remained close by—standing "on the stairs and right in front of the courthouse * * *."

---

[14]  We note that Attorney Balkcom did not indicate the name of the bridge during her testimony, but only described its location.  However, based on the entirety of her testimony, it is clear to us that she was referring to the Crawford Street Bridge.

It was further Mr. Smith's testimony that, about fifteen or twenty minutes later, he told the group standing outside to leave the area. He stated that the group, which defendant had now rejoined, proceeded up College Street and got into several vehicles; he added that defendant was sitting in the driver's seat of a SUV-style BMW. Mr. Smith testified that, from a window inside the courthouse, he watched the cars drive down College Street in the direction of Benefit Street. He stated that, at some point thereafter, he heard gunshots and that he then proceeded to the first floor of the courthouse, ran across South Main Street toward the Crawford Street Bridge,[15] and observed "a white vehicle that had just been shot up."

### iv. The Testimony of Samuel

An individual to whom we shall refer as "Samuel"[16] also testified as to what occurred on January 9, 2017. Samuel stated that, as of that date, he was a member of the Bucket East gang. He testified that he and other members of that gang went to the courthouse on January 9 because they were going to "target Carlos Depina,"

---

[15] It should be noted that, like Attorney Balkcom, Mr. Smith did not indicate the name of the bridge during his testimony but only referred to its location. Based on the entirety of his testimony and the record as a whole, it is clear to us that he was referring to the Crawford Street Bridge.

[16] We refer to said witness pseudonymously in view of his status as a minor at the time of trial.

a member of the Bucket West gang, who had a court appearance scheduled for that day.

Samuel stated that, when he ultimately left the courthouse with other members of the Bucket East gang, he got into a black BMW and that defendant got into the driver's seat of the same car. Samuel further testified that, while they were driving, defendant located and followed the "white Chevy" in which Carlos Depina had arrived at the courthouse. He added that, soon thereafter, defendant pulled the BMW next to the "Chevy" and fired shots "[s]ix, seven times" into that vehicle.

### v. The Testimony of Geovanni Perez

At trial, Mr. Perez testified consistently with the testimony which he had provided at the pretrial suppression hearing. And he provided an in-court identification of defendant as the man he had seen driving the BMW on January 9, 2017.

### vi. The Testimony of Detective Jonathan Primiano

Detective Jonathan Primiano testified that, at the time of trial, he was a detective in the Investigative Bureau of the Providence Police Department. Detective Primiano testified that, in addition to carrying out his usual duties, he also worked with the Digital Forensics Unit, where he dealt with "computer, video and mobile forensics." He stated that, with respect to the instant case, he "assisted in some digital video forensics." He testified that videos taken from different

vantage points throughout the city on January 9, 2017 were turned over to him for analysis.[17] Detective Primiano identified the individual videos which he reviewed as well as (1) a compilation of videos that was produced by "IT people here at the courthouse" and (2) a "PowerPoint presentation" that he had created based on information contained in the videos. Each of the individual videos as well as the video compilation and the "PowerPoint presentation" were entered into evidence as full exhibits, without objection from defense counsel. (Defense counsel's only objection was to Detective Primiano's "narration and identification of the individuals who are allegedly depicted in the video[s], including the defendant.")

### vii. The Testimony of Correctional Officer Jon Defilippis

Jon Defilippis was called by the state to rebut the testimony of Carlos Depina, who had testified that he had never before seen defendant. He stated that, as of the time of trial, he was working as a correctional officer at the Adult Correctional Institutions. He stated that, while working at the ACI, he had witnessed a fight between Carlos Depina and defendant, but that he did not know who started the fight. Defense counsel neither objected to the admission of Mr. Defilippis's testimony nor requested a cautionary instruction to the effect that the evidence could be used only for purposes of impeachment.

---

[17] Detective Primiano testified that the videos he analyzed came from "[t]he Rhode [Island] School of Design, Brown University, the Superior [Court], and One Financial Square."

### 3. The Verdict

After the presentation of all the evidence, and after closing arguments and the jury instructions, the jury found defendant guilty on Counts One, Two, Three, Four, and Six. Pursuant to a stipulation in the case, Count Seven was decided by the trial justice rather than the jury; the trial justice adjudged defendant guilty on that Count.[18]

### E

### The Sentencing Hearing

On March 29, 2018, defendant was scheduled to appear before the trial justice for sentencing. Before the sentencing hearing began, however, defendant refused to leave the courthouse cell block. The trial justice directed defense counsel to inform defendant of his right to be present at the sentencing hearing and to advise him that, should he fail to appear, he would "waive any and all rights and steps and measures that are taken at [the] sentencing proceeding * * *." After speaking with defendant in the cellblock, defense counsel informed the trial justice that, after she had advised defendant as to his rights, he stated: "'You're not my lawyer. I'm going to represent myself.'"

The defendant entered the courtroom shortly thereafter, at which point he made comments to a similar effect—namely, that he would not be represented by

---

[18]     *See* footnote 1, *supra*.

counsel at the sentencing hearing and would instead be representing himself. More specifically, defendant stated that he wished to represent himself for the following reasons: "Because [counsel] put in a motion for a new trial two weeks after my conviction, without telling me. She never consulted with me and I just got newly-discovered evidence that I'm going to present * * *."

In responding to defendant's expressed wish to proceed *pro se*, the trial justice pointed out that this was not the first time during the course of the various proceedings relative to this case that defendant had attempted to separate himself from defense counsel. The trial justice further stated: "I thought you realized how ill-prepared you were to undertake your own representation and it seemed, at least at first blush, that you regretted your mistake in trying to do so, and you again realigned yourself with [defense counsel]." He then stated that, based on defendant's behavior[19] and his expressed intention to proceed *pro se* at the sentencing hearing, "it is clear to me that you still do not understand or appreciate the risks and disadvantages of trying to represent yourself, even though I have previously warned you about the proverbial adage of having a fool for a client,

_____

[19] The trial justice noted that defendant had "tried to obstruct the sheriffs;" "loudly paraded down the hallway outside this courtroom, proclaiming that this was 'a circus and where were the balloons[;]'" "openly cursed this [c]ourt and behaved insultingly and disrespectfully to the point of being held in contempt;" "vaulted to [his] feet loudly and yelled, 'Objection' three times" during cross-examination of a certain witness; and "[l]ater during the trial [he] became disengaged, turning [his] chair around, turned [his] back to the jury for a great length of time, staring at the gallery and/or out the window."

which you so quickly dismissed." The trial justice proceeded to tell defendant that he had found that "the two-part test to support an election to represent yourself has not at all been satisfied. The attempt to waive counsel is not fully voluntary and it is certainly not knowing and intelligent." Accordingly, the trial justice denied defendant's expressed desire to proceed *pro se* at the sentencing hearing.

The defendant was sentenced as follows: twenty years to serve on Count One; twenty years to serve, without parole, on Count Two (consecutive to Count One); ten years to serve on Count Three (concurrent with Count One); ten years to serve on Count Four (concurrent with Count One); fifteen years to serve on Count Six (consecutive to Count Two); ten years to serve on Count Seven (consecutive to Count Six); and, as a habitual offender, he was sentenced to twenty-five years, with fifteen years to serve without parole, and the remaining ten years suspended, with probation, to be served consecutively to Count Seven. A notice of appeal to this Court was timely filed.

## II

### Issues on Appeal

On appeal, defendant contends that: (1) the trial justice erred by granting a mistrial and thereby violating his constitutional right against being put in double jeopardy; (2) the trial justice erred by denying the motion to suppress a particular eyewitness identification; (3) the trial justice erred by denying the motion to

- 23 -

recuse; (4) the trial justice erred by denying defendant's right to represent himself at trial and at the sentencing hearing; and (5) the trial justice erred by allowing into evidence certain videos and testimony. We shall now proceed to address defendant's various contentions.

## III

## Analysis

## A

## The First Mistrial and the Double Jeopardy Contention

The defendant asserts on appeal that there is nothing in the record to indicate that he consented to a mistrial following Attorney Balkcom's reference to "the violation hearing" in the course of the first trial. He contends that he never discussed the mistrial issue with his trial attorney and that, when he questioned the trial justice as to the ramifications of a mistrial, the trial justice provided an erroneous response. The defendant argues to this Court that, because he did not consent and because the trial justice "sua sponte reverse[d] his previous denial of the mistrial," his subsequent trials on the same charges violated his rights under the double jeopardy provision in the Fifth Amendment to the United States Constitution.[20] We need not reach the substance of this argument because defendant has failed to properly preserve it for our review.

---

[20]    *See* footnote 7, *supra*.

Pursuant to Rule 12(b)(2) of the Superior Court Rules of Criminal Procedure, the defense of double jeopardy "may be raised *only by motion before trial*." (Emphasis added.)  *See State v. Day*, 925 A.2d 962, 977 (R.I. 2007); *State v. Thomas*, 654 A.2d 327, 330 (R.I. 1995).  We have stated that "failure to raise such a motion before trial precludes that defendant from thereafter raising a double jeopardy challenge." *Day*, 925 A.2d at 977.  It is true that we have also stated that, upon a showing of good cause, a "defendant can obtain relief from the strong medicine that Rule 12(b)(2) dispenses * * *." *State v. Feliciano*, 901 A.2d 631, 647 (R.I. 2006).  However, our case law also makes clear that "[o]nly in limited circumstances will this [C]ourt review a claim of double jeopardy despite its improper assertion." *Thomas*, 654 A.2d at 330.  And in those limited circumstances, "the burden is on a defendant to show cause why relief should be granted notwithstanding the untimely assertion of the defense." *State v. Lee*, 502 A.2d 332, 334 (R.I. 1985).

In the present case, it is undisputed that defendant failed to submit before the start of his second trial a motion to dismiss on the grounds of double jeopardy pursuant to Rule 12(b)(2).  In fact, in the course of arguing before this Court, defendant candidly conceded this point as well as the fact that no such motion was made before his third trial commenced.  Although it is true that defendant eventually brought to the trial justice's attention his contention relative to double

- 25 -

jeopardy, we note that that did not occur until halfway through jury *voir dire* on the third day of defendant's second trial. After careful consideration, it is our view that, because defendant did not "show cause why relief should be granted notwithstanding the untimely assertion of the defense," we are convinced that the instant case does not constitute one of the "limited circumstances" referenced in the *Thomas* opinion. *Thomas*, 654 A.2d at 330 (internal quotation marks omitted). Instead, it is our view that Rule 12(b)(2) as explicated in the *Day* opinion is controlling. *See Day*, 925 A.2d at 977. Accordingly, we are convinced that there is no need to reach the merits of defendant's belatedly raised double jeopardy contention.

## B

## Denial of Motion to Suppress Eyewitness Identification

The defendant contends on appeal that, because Mr. Perez's identifications were "tainted," the trial justice erred in denying the motion to suppress that identification. He bases his contention about the identification being "tainted" on the fact that the lead detective assigned to his case conducted what defendant characterized as a "single photo show up" with Mr. Perez prior to the sequential photo display. The defendant contends in essence that, because Mr. Perez was the sole unbiased witness, the faulty identification procedure "ruined the neutrality" of

his identification, which served to "buttress the * * * testimony of the cooperating co-defendants that testified against defendant."

It is well established that, when reviewing a trial justice's denial of a motion to suppress evidence, we will "defer to the factual findings of the trial justice, applying a clearly erroneous standard." *State v. Gonzalez*, 136 A.3d 1131, 1145 (R.I. 2016) (internal quotation marks omitted); *see State v. Washington*, 189 A.3d 43, 56 (R.I. 2018). We have further stated that, "[i]n making this determination, we assess the available evidence in the light most favorable to the state." *State v. Gallop*, 89 A.3d 795, 801 (R.I. 2014) (internal quotation marks omitted).

In this context, the trial justice must undertake a two-step analysis to determine the propriety of an eyewitness identification procedure. *Washington*, 189 A.3d at 55; *see State v. Austin*, 114 A.3d 87, 94 (R.I. 2015); *Gallop*, 89 A.3d at 801. First, the trial justice must determine whether the procedure used was "unnecessarily suggestive." *Gallop*, 89 A.3d at 801 (internal quotation marks omitted). We have explicated the concept of unnecessary suggestiveness by stating that, to fall into that category, "an identification procedure must have been so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification * * *." *Id.* (internal quotation marks omitted). Then, if the trial justice does find that the identification procedure at issue was unnecessarily suggestive, "he or she must look at the totality of the circumstances

to determine whether the identification was nevertheless reliable." *Washington*, 189 A.3d at 55. In dealing with the reliability issue, the trial justice is called upon to consider various factors. *See, e.g.*, *Gallop*, 89 A.3d at 801; *State v. Patel*, 949 A.2d 401, 411 (R.I. 2008)). If, after evaluating these factors, "the trial justice concludes that the identification has independent reliability, then [the identification] will be admissible notwithstanding the suggestiveness of the procedure employed." *Gallop*, 89 A.3d at 801.

The defendant contends on appeal that what he calls the "single photo show up" was unnecessarily suggestive and that it tainted the reliability of the identification procedure. With respect to the first step of the analysis, the trial justice quite correctly commented at the outset (in what appears to us to have been an ironic understatement) that presenting the single photograph of defendant in the BMW before presenting the photo display was not "the best way of doing things." However, he further observed that said photo did not "clearly or obviously depict defendant * * *." Moreover, he added that, in spite of the fact that he himself had seen defendant in the courtroom on multiple occasions, he could not "look at that BMW photograph and positively state that the driver is [defendant]." It is noteworthy that, during his discussion with respect to the question of the unnecessary suggestiveness of the identification procedure, the trial justice did not explicitly state that the procedure was actually unnecessarily suggestive. In any

event, the trial justice nonetheless proceeded to address the second step of the analysis. He explicitly stated that he "categorically and without hesitation" determined that Mr. Perez's identification was otherwise reliable. In coming to this conclusion, the trial justice went through the factors enunciated in *Neil v. Biggers*, 409 U.S. 188 (1972), and then made the following insightful case-specific statement:

> "[A]ll four of the[] salient elements outlined in *Gallop* and the *Biggers* case under the totality of the circumstances are readily satisfied.
>
> "More than that, I would point to the testimony of Mr. Perez during these proceedings, that when he called the police on January 19, he did so precisely because of his independent recollection of the events on Benevolent Street on January 9, which he realized may have had something to do with the shooting downtown. That independent recollection was based on his own memory before the police ever showed him any photographs.
>
> "More than that, Mr. Perez testified that he has a penchant, an ability for remembering people's faces and which ones go with which vehicles. It is, after all, what he does for a living. He's a professional valet. He simply has a knack for remembering the connections between a face and a car. It's what he does. And I fully credit his testimony in this regard. He was not bragging or boasting. He was simply stating a fact about himself, and I believe him."

Even though the trial justice never stated with specificity that the identification was or was not unnecessarily suggestive, we are more than satisfied that, based on his further clear and detailed explication about Mr. Perez's talent for "remembering

- 29 -

people's faces," even if the trial justice had found unnecessary suggestiveness, the trial justice's determination that the identification was otherwise reliable was especially well-founded. Accordingly, we perceive no error whatsoever in the trial justice's denial of the motion to suppress Mr. Perez's eyewitness identification.

Nevertheless, while we do not hesitate to uphold the trial justice's ruling about the eyewitness identification in *this* case, we believe that it is imperative to emphasize that we view as unfortunate the procedure employed by the investigating detectives—especially given the emphasis that the General Assembly has placed on improving the policies and procedures of law enforcement with respect to eyewitness identifications.[21]

## C

### Denial of the Motion to Recuse the Trial Justice

The defendant further contends that the trial justice erred by summarily denying defendant's motion for recusal at the beginning of the third trial. The defendant argues that the trial justice was prejudiced against him and should have

---

[21] Notably, during its 2010 session, the General Assembly enacted G.L. 1956 § 12-1-16, which created a task force charged with "develop[ing] guidelines for policies, procedures and training with respect to the collection and handling of eyewitness evidence in criminal investigations by law enforcement agencies in Rhode Island." Although we recognize that the final report produced by the task force pursuant to this statutory mandate is simply a guideline, we consider it to be of genuine importance that investigating officers constantly strive to avoid any unnecessary suggestiveness in the context of eyewitness identification.

recused himself because the trial justice had: (1) previously held defendant in contempt of court; (2) denied his request for a continuance to continue preparing his defense; (3) violated Rule 42 of the Superior Court Rules of Criminal Procedure;[22] (4) tried to persuade defendant not to represent himself at trial; and (5) attempted to "goad" or "wheedle" him into agreeing to a mistrial. For the reasons set forth below, we are of the opinion that the trial justice did not err in denying defendant's motion for recusal.

It is a well-settled principle that "judicial officers are duty-bound to recuse themselves if they are unable to render a fair or an impartial decision in a particular case." *Ryan v. Roman Catholic Bishop of Providence*, 941 A.2d 174, 185 (R.I. 2008) (internal quotation marks omitted); *see Mattatall v. State*, 947 A.2d 896, 902 (R.I. 2008). However, "[i]t is an equally well-recognized principle that a trial justice has as great an obligation *not* to disqualify himself or herself when there is

---

[22]  Rule 42(b) of the Superior Court Rules of Criminal Procedure provides as follows: "A criminal contempt except as provided in subdivision (a) of this rule shall be prosecuted on notice. The notice shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense, and shall state the essential facts constituting the criminal contempt charged and describe it as such. The notice shall be given orally by the judicial officer in open court in the presence of the defendant or, on application of an attorney for the State or of an attorney appointed by the court for that purpose, by an order to show cause or an order of arrest. The defendant is entitled to admission to bail as provided in these rules. In a *proceeding under this subdivision*, if the contempt charged involves disrespect to or criticism of a judicial officer, that judicial officer is disqualified from presiding at the trial or hearing except with the defendant's consent. Upon a verdict or finding of guilt the court shall enter an order fixing the punishment." (Emphasis added.)

no sound reason to do so * * *." *Kelly v. Rhode Island Public Transit Authority*, 740 A.2d 1243, 1246 (R.I. 1999) (emphasis added); *see Ryan*, 941 A.2d at 185. We have stated that "[a] party seeking recusal must establish that the [trial] justice has a personal bias or prejudice by reason of a preconceived or settled opinion of a character calculated to impair his [or her] impartiality seriously and to sway his [or her] judgment." *Ryan*, 941 A.2d at 185 (internal quotation marks omitted).

In the instant case, defendant has completely failed to show that the trial justice held any personal bias or prejudice against him so as to make the trial justice "duty-bound" to recuse himself. *Id.* First, although the trial justice held defendant in contempt of court during the second aborted trial, only two days later the trial justice, after a modicum of advocacy by defense counsel, purged the finding of contempt. After carefully reviewing the record, it is our view that the contempt finding was not a result of a "preconceived or settled opinion of [defendant's] character * * *." *Id.* (internal quotation marks omitted). Instead, the trial justice stated that, during the course of the proceedings before him, defendant did not cooperate with the sheriffs; he uttered vulgarities directed at the court; he raised his voice; he was argumentative; and he interrupted the trial justice. We would further point out that, following the trial justice's purging of the contempt finding, he also granted defendant a new trial in order to "protect [defendant] from

any kind of adverse impression that the present jury might draw if we were to go forward as it has been conscripted * * *."

Second, although the trial justice assented to defendant's request to represent himself at the second aborted trial, he stated that he would not grant defendant's request for a continuance of the proceedings because defendant had "spr[u]ng this on [him] at the last minute" and because there was "a jury upstairs that [the parties had] begun to impanel * * * [and] other new jurors that [the parties were] going to use to finish the impanelment." Given the timing of defendant's decision to proceed *pro se* and his statements to the trial justice with respect to his assessment of his own legal qualifications, we do not perceive the denial of the continuance as the product of any bias or prejudice, but rather as the product of the trial justice's understanding that, in the interest of justice and judicial economy, he wanted the trial to proceed in a timely and efficient manner.

Third, in arguing that the trial justice must be precluded from presiding at his trial pursuant to Rule 42 of the Superior Court Rules of Criminal Procedure, defendant misconstrues the meaning of that rule. That rule states, in pertinent part, that "[i]n a *proceeding under this subdivision*, if the contempt charged involves disrespect to or criticism of a judicial officer, that judicial officer is disqualified from presiding at the trial or hearing except with the defendant's consent." Super. R. Crim. P. 42(b) (emphasis added). By cherry-picking language from the rule,

defendant blatantly ignores the fact that the dictates of that rule apply only to *"proceeding[s] under [that] subdivision"*—in other words, contempt proceedings. *Id.* (emphasis added). We would point out that defendant was never subject to a Rule 42(b) proceeding before the trial justice; accordingly, the cited rule is not applicable to the case at bar.

It is clear to us that, far from being prejudiced and biased, the actions taken by the trial justice were entirely appropriate and were, in fact, necessary so that a fair and just trial might be conducted. Accordingly, it is clear to us that the trial justice certainly did not err in deciding not to recuse himself from defendant's case. *See Ryan*, 941 A.2d at 186; *Kelly*, 740 A.2d at 1246.

**D**

**Denial of Defendant's Right to Self-Representation**

The defendant asserts on appeal that he was denied his constitutional right to self-representation. He specifically argues: (1) that the trial justice "stymied" his attempts to prepare his own defense at trial; and (2) that the trial justice erred in denying him the right to represent himself during his sentencing hearing. For the following reasons, we are of the opinion that the trial justice did not err in so doing.

Pursuant to the United States Supreme Court's ruling in *Faretta v. California*, 422 U.S. 806 (1975), "[t]he Sixth Amendment does not provide merely

that a defense shall be made for the accused; it grants to the accused personally the right to make his defense." *Faretta*, 422 U.S. at 819. "The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails." *Id.* at 819-20. The Supreme Court has further stated that "[t]he *pro se* defendant must be allowed to control the organization and content of his own defense, to make motions, to argue points of law, to participate in *voir dire*, to question witnesses, and to address the court and the jury at appropriate points in the trial." *McKaskle v. Wiggins*, 465 U.S. 168, 174 (1984).

This Court has further noted that "a defendant may proceed *pro se* if he or she wishes *only so long as* the waiver of his or her right to counsel is valid." *State v. Withers*, 172 A.3d 765, 771 (R.I. 2017) (emphasis added). "In order for a waiver to be valid, a defendant must waive his or her right to counsel voluntarily, knowingly, and intelligently." *State v. Cruz*, 109 A.3d 381, 390 (R.I. 2015). To determine whether such a waiver was valid, "this Court employs a two-prong analysis * * *." *Id.* First, we must "determine whether the waiver was 'voluntary * * *.'" *Id.* After that, "we must determine whether the waiver was 'knowing and intelligent.'" *Id.* We conduct this two-pronged inquiry in a *de novo* manner, and we proceed by considering the "totality of the circumstances" as set

forth in *State v. Chabot*, 682 A.2d 1377 (R.I. 1996).[23] *Id.* at 390. We have stated

that "[a] valid waiver is effective only if a defendant knows what he [or she] is

doing and his [or her] choice is made with eyes open." *Id.* (internal quotation

marks omitted).

The defendant has presented conflicting arguments. In his brief before this

Court, defendant has conceded (1) that, at some point during his trial, he "had

assumed the responsibilities of representing himself" and (2) that "[t]he trial court

had finally[] acceded to [his] request for self-representation." He also argues on

appeal, however, that during the course of his attempt to represent himself at trial,

---

[23] In *State v. Chabot*, 682 A.2d 1377 (R.I. 1996), the Court set forth six factors that a trial justice may use as a guide in determining whether a defendant's request to represent himself was made voluntarily, knowingly, and intelligently. *See State v. Withers*, 172 A.3d 765, 771 (R.I. 2017). The Court in *Chabot*, in the context of a probation violation hearing, stated that the following factors should be considered:

> "(1) the background, the experience, and the conduct of the defendant at the hearing, including his age, his education, and his physical and mental health; (2) the extent to which the defendant has had prior contact with lawyers before the hearing; (3) the defendant's knowledge of the nature of the proceeding and the sentence that may potentially be reimposed; (4) the question of whether standby counsel has been appointed and the extent to which he or she has aided the defendant before or at the hearing; (5) the question of whether the waiver of counsel was the result of mistreatment or coercion; and (6) the question of whether the defendant is trying to manipulate the events of the hearing." *Chabot*, 682 A.2d at 1380.

- 36 -

"he presented the trial court with several motions, seeking the information that any attorney would have needed in order to be prepared to present a defense," and that each motion was summarily denied, thereby stymying his ability to prepare his defense. In particular, defendant argues that, after he began representing himself, the trial justice erred by denying the following motions: his motion for a continuance; his motion to review the exhibits presented at the first trial; his motion to preclude the state from calling Attorney Balkcom as a witness at subsequent trials; and his motion to receive the transcript of the sidebar conference that was held during Attorney Balkcom's testimony at the first trial. We are not persuaded by defendant's argument.

The defendant fails to meaningfully explain how the trial justice's denial of the just-referenced motions interfered with his ability to present his defense or otherwise control his case. Although a defendant has certain rights when proceeding *pro se*, a defendant does not thereby acquire the right to obtain a favorable ruling on any or all of the motions that he or she presents to the court. *See, e.g.*, *McKaskle*, 465 U.S. at 174 n.4, 181. We are satisfied that, in spite of defendant's frequent and utterly inappropriate behavior towards the trial justice, the trial justice judiciously scrutinized each of defendant's motions and provided explanations for his subsequent denials. In other words, defendant was not prevented from "hav[ing] his voice heard" in accordance with the Supreme Court's

teaching in *McKaskle*. *Id.* at 174. We are convinced that the trial justice in no way stymied defendant's efforts to prepare and present a defense.

The defendant also asserts before this Court that the trial justice erred by denying him his right to self-representation at the time of the sentencing hearing. We recognize that the trial justice did, in fact, deny defendant the right to represent himself during the sentencing hearing. However, we have stated that a defendant's right to represent himself or herself is valid only "*so long as* the waiver of his or her right to counsel is valid." *Withers*, 172 A.3d at 771 (emphasis added). We perceive no reversible error in the trial justice's assessment of the defendant's overall conduct and performance in the various proceedings that ultimately led up to the sentencing hearing. And we, therefore, perceive no reversible error in the trial justice's conclusion that defendant's waiver of his right to counsel at the sentencing hearing was simply not "valid." *Id.*

In responding to defendant's request to proceed *pro se* at the sentencing hearing, the trial justice explicitly referenced both the two-prong test used to determine whether a waiver of counsel is voluntary as well as the six factors enumerated in *Chabot*. We find persuasive the trial justice's determination that, based on defendant's actions and conduct throughout the numerous proceedings before the Superior Court, it was clear that, at the time of the sentencing hearing, defendant did not "understand or appreciate the risks and disadvantages of trying

- 38 -

to represent [himself], even though [the trial justice had] previously warned [him] about the proverbial adage of having a fool for a client * * *." Accordingly, we perceive no error in the trial justice's express finding that "the two-part test to support an election to represent yourself has not at all been satisfied," nor in his further statement that "[t]he attempt to waive counsel is not fully voluntary and it is certainly not knowing and intelligent." In view of the trial justice's findings and the record as a whole, we are of the opinion that defendant's waiver of his right to counsel was not voluntary, knowing, and intelligent. Accordingly, it is our view that the trial justice did not err in denying defendant the right to represent himself at the sentencing hearing.

For these reasons, it is our view that defendant's various arguments concerning his right to self-representation are unavailing.

**E**

**Evidentiary Rulings**

**1. The Introduction of the Composite Video**

The defendant argues on appeal that the trial justice erred in allowing into evidence "the composite videotape detailing the travels of the vehicles involved in the alleged chase scene on the roads surrounding the Providence Superior Court on January 9, 2017." The defendant contends that "[t]he individual videotapes that were secured by the Providence Police Department used to create the composite

- 39 -

video were never authenticated and no chain of custody was ever established for the introduction." Contrary to defendant's assertions, however, each of the individual videos, the composite video, and the "PowerPoint presentation" were authenticated and admitted as evidence with no objection having been interposed by defense counsel. For this reason, we are satisfied that this issue has not been properly preserved for appellate review. *See State v. McManus*, 990 A.2d 1229, 1237 (R.I. 2010) ("According to our well settled raise or waive rule, if an issue was not preserved by specific objection at trial, then it may not be considered on appeal."); *see also State v. Kelly*, 20 A.3d 655, 660 (R.I. 2011).

### 2. The Introduction of Rebuttal Testimony of Correctional Officer Jon Defilippis

The defendant contends that the trial justice erred in failing to provide the jury with certain cautionary instructions following the testimony of a witness who was called upon to testify for the sole purpose of impeaching the testimony of Carlos Depina that he had never before seen defendant. Specifically, defendant argues that, as a result of the testimony provided by Officer Defilippis, the jury became aware of defendant's status as an inmate at the ACI, which impacted his right to a fair trial. Although defendant objected to the testimony of Officer Defilippis, at no point did he request that a cautionary instruction be given to the jury following such testimony. Since defendant did not request a cautionary instruction or object to the fact that the trial justice did not give such an instruction,

- 40 -

this issue is not properly preserved for appellate review. *See State v. Garcia*, 743 A.2d 1038, 1053 (R.I. 2000).

## IV

## Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record may be returned to that tribunal.



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Joseph Segrain. |
| **Case Number** | SU-2018-144-C.A.<br>(P1/17-1236 AG) |
| **Date Opinion Filed** | June 24, 2021 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice William P. Robinson III |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Robert D. Krause |
| **Attorney(s) on Appeal** | For State:<br><br>Owen Murphy<br>Department of Attorney General<br>For Defendant:<br><br>Christopher S. Gontarz, Esq. |