March 13, 2023

**Supreme Court**

No. 2020-192-C.A.
(P2/17-1272ADV)

State                                         :

     v.                                     :

Edward Delossantos.                           :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

|  |  |
|---|---|
| State | : |
| v. | : |
| Edward Delossantos. | : |

Present:  Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

## O P I N I O N

**Justice Robinson, for the Court.**  The defendant, Edward Delossantos, appeals from a judgment of conviction and commitment following a jury trial in the Providence County Superior Court.  On appeal, the defendant challenges the trial court's decision to grant his request to represent himself at his criminal trial, arguing that the request was untimely and that the waiver of his right to the assistance of counsel was not made voluntarily, knowingly, and intelligently.  The defendant also appeals from the trial court's denial of his motion for a new trial.  For the reasons set forth in this opinion, we perceive no error in the trial court's decision to grant the defendant's request to represent himself nor in its denial of the defendant's motion for a new trial.

# I

## Facts and Travel

This case ultimately stems from an altercation that took place in Woonsocket, Rhode Island, in October of 2016. That altercation involved defendant and two other adults and resulted in criminal charges being brought against defendant. The facts relative to that altercation and the eventual charges against him will be more fully explained as we summarize the trial testimony of the various witnesses.

On May 17, 2017, defendant was charged by information with the following offenses: assault with a dangerous weapon, to wit, a motor vehicle (Count One); operating a motor vehicle without the consent of its owner (Count Two); domestic assault and battery with a dangerous weapon, to wit, a shod foot (Count Three); domestic simple assault (Count Four); simple assault (Count Five); and vandalism (Count Six). A three-day jury trial was held in November of 2019. We relate below the salient aspects of what transpired at the trial.

## A

### The First Day of Trial

On November 12, 2019, the first day of trial, prior to jury selection, the trial justice asked defendant whether he wanted to accept the state's offer regarding a plea agreement. The defendant stated that he chose not to accept the state's offer,

and the trial justice then addressed him as follows: "So that you understand, you could get anywhere, if you're convicted, from zero years to serve up to six years to serve. Do you understand that, sir?" The defendant responded: "Yes, I understand that, your Honor." The jury selection process then commenced.

## B

## The Second Day of Trial

### 1. The Testimony of Veronica Flores

On November 13, 2019, the second day of trial, Veronica Flores testified that, at the time of the October 2016 incident, she had been in a relationship with defendant since 2011 and was living in Woonsocket with him and their two daughters. She further testified that on October 4 she and defendant had an argument at the house where they both lived, which culminated with defendant departing in her car. Veronica stated that the next day, October 5, her sister, Sabrina Flores,[1] picked her up and drove to BJ's Distribution Center in Uxbridge, Massachusetts, where both sisters were scheduled to work on the same shift.

Veronica testified that she and Sabrina returned from the Distribution Center around 12:45 a.m. on October 6 and that Sabrina parked her car on a side street near the home where Veronica and defendant lived. Veronica further testified that,

---

[1] The two complaining witnesses in this case are sisters with the same last name. We shall hereinafter refer to Veronica Flores and Sabrina Flores by their first names. We do so for the sake of simplicity, and we intend no disrespect.

as they were preparing to get out of the car, Sabrina warned her that defendant was "walking down right now." She added that she and Sabrina locked the car doors. She further stated that defendant proceeded to punch the passenger-side window of Sabrina's car.

Veronica further testified that, after she and Sabrina had exited Sabrina's car, defendant "whipped a muffin" at Sabrina's face and then started "throwing punches." She stated that defendant then returned to her car (which he had taken on the previous day) and "got a kitchen knife." She testified that defendant "stabbed the knife like right into the tire of [Sabrina's] car * * * inches away from [Sabrina's] leg." She added that defendant then "shoved" Sabrina, causing her to fall "head first * * * into the tire of her car." Veronica testified that defendant punched her in the head and punched Sabrina in the face. Veronica further testified that defendant shoved her into a fence and that, while wearing sneakers, he kicked her "all over [her] body." Veronica stated that a man "came out of nowhere * * * holding a stick or something and was trying to fight off him, or from him being on top of us and still like us just fighting in general." She added that the man "tried to intervene;" she also testified that he said that he had called the police. It was further Veronica's testimony that defendant then departed in her car, without her permission.

## 2.  The Testimony of Sabrina Flores

Sabrina testified that she had parked her car on a side street near where Veronica and defendant lived.  She further testified that, while looking into her rearview mirror, she saw defendant walking towards her car and that he then started "pounding on the side of the car" with "a closed fist."  She stated that he yelled at the sisters, telling them to "[g]et out of the car."  It was further Sabrina's testimony that, after the sisters exited the car, defendant threw a muffin "[v]ery hard" at her face.  She added that defendant then walked "swiftly like he was in a rush" towards Veronica's car, where he "opened the driver's side door and he pulled out * * * a kitchen knife."  Sabrina testified that defendant then "slammed the door shut, and * * * walked faster towards my car on the driver's side," where he stabbed her front left tire, causing the knife to break into three pieces.  Sabrina further testified that defendant "got even more aggravated" and then pushed her into her car, causing her to fall to the ground.

Sabrina testified that, while lying on the ground or trying to get up, she noticed that defendant "had pushed Veronica and punched her, and she had fell into the black fence."  She further testified that defendant, who was wearing sneakers, then kicked Veronica in "her torso area."  Sabrina stated that she helped Veronica get up from the ground.  She then described what happened next: "That's when it got more physical.  We kind of took that altercation and it navigated

towards the middle of the street." She added that, during the altercation, defendant punched the sisters with a closed fist "probably about five or six times."

Sabrina further testified that "as we were all fighting, * * * we heard a voice from the distance." She added that "[i]t just happened to be a neighbor of * * * Veronica's that was coming down the street." Sabrina described the neighbor as "aggravated," and she said that he "had a bat or like a pole of some sort in his hand" and that he said that he had called the police.

Sabrina testified that defendant then "walked towards the car" and that she and Veronica "tried to stop him from going." Sabrina further stated: "[Defendant] turned on the car, he went to go pull away, he noticed that I was in the front of it, and he kind of -- he pressed on the gas * * *." Sabrina further testified that she then put her "hands on the hood" and pushed herself "to the side to step out of the way of the vehicle." She added that defendant then drove off "pretty quickly."

### 3. The Testimony of Robert Lescault

Robert Lescault, the intervening neighbor referred to by both Veronica and Sabrina, testified that, during the early morning hours of October 6, 2016, he was awakened from sleep by the sound of a "loud bang." He testified that he "got up and ran to the window," from which he saw two females and one male "tussling around." Mr. Lescault further stated: "I saw the two females trying to keep the male from jumping into a truck. And once they started doing that, he grabbed

- 6 -

them both and he started swinging at them and punching at them like they were males." He testified that he then grabbed "a wooden stick" and "ran down towards them." He further testified that, as he was running towards the altercation, he witnessed defendant hit Veronica and Sabrina with a closed fist.

Mr. Lescault also testified that defendant "charged" at him and "threw three punches" at him. He added that defendant then "went back toward the truck to try to get back into the truck, and the females continued to keep him out of the truck." Mr. Lescault testified that "[t]he smallest female tried to pull [defendant] out of the truck, and he grabbed her by the hair and started punching her in the face." He added that the woman whom he described as "the smallest female" "fell back towards the fence area in front of that building, and the other taller female was like in between the front fender of the truck and the door being opened, and she was reaching over the door and grabbing him." Mr. Lescault stated that defendant then "stepped back out and he struck [the taller female] over the door, and she fell back, she stumbled down the sidewalk and kind of into the road, and that's when he shut the door and tried to take off and almost ran her over."

## 4. Defendant's First Request to Represent Himself[2]

At that juncture, the state having rested, the trial justice asked defendant whether he wished to testify on his own behalf.[3]  In response, defendant stated: "I haven't had time to come to an agreement to testify."  The trial justice responded:

> "No, sir, you have had time.  We've done nothing but delay, delay, delay.
>
> "* * *
>
> "We have wasted an inordinate amount of time today with this jury.  First, with your insistence that you have your attorney verify for himself that witnesses were here.  I allowed him to do that.  Second, with the idea that you might possibly want to entertain a plea.  Despite the fact that the time had come and gone for that, I allowed him to do that.  We spent some time this afternoon going through a voir dire that you insisted on being present for. So this isn't something new.  This case was reached for trial yesterday and you've known about it for a month now.
>
> "I will give you ten minutes to speak to your attorney, but we're going to have an answer from you today because this jury is not here at your pleasure, your disposal, for you to take as long as you think is possible.

---

[2]    All of the colloquies between the trial justice and defendant or his counsel took place out of the presence of the jury.

[3]    Because of the special relevance of the colloquies between the trial justice and defendant to the legal issues before us, we shall quote from those colloquies verbatim more extensively than might otherwise be the case. *See State v. Cruz*, 109 A.3d 381, 390 (R.I. 2015) ("[T]he presence of a detailed colloquy between a trial justice and a defendant on the record assists the trial justice in ascertaining the knowing and intelligent nature of a defendant's waiver.").

You can have a conversation with him, but I'm going to want an answer this afternoon. Do you understand that?"

The defendant replied that he understood, and he then stated: "You're actually trying to make me testify at the last minute, but I was never prepared for none of this."

In response, the trial justice stated:

> "I'm not trying to make you do anything. I'm actually just trying to determine whether or not it's your desire to testify. When you tell me you haven't had enough time to consider it, my point to you is this. You had enough time. We went through this yesterday. We've been going at it all day today with really long breaks in between. The idea of you testifying is not something new, nor is the information that was testified to by the witnesses because the statements were here.

> "I do understand, sir -- and I mean this with all sincerity -- that you wanted to see whether or not the witnesses were coming. That's fair. I get that because quite often witnesses don't appear. But, they did. They testified. You knew what they were going to testify to because you've had all the discovery. So, your decision as to whether or not you would testify isn't something that's just been thrown on you out of the blue without you having had any time to think about it. That's the point.

> "It doesn't matter to me one way or the other whether you testify. I'm not going to force you to do a single thing, but what I am not going to allow is this continued unnecessary delay that we seem to be having. So, I'm going to give you time to talk to your attorney."

The court recessed for approximately ten minutes. The trial justice asked defense counsel whether defendant was going "to testify or * * * waive his right to do so." Defense counsel stated: "I believe he wants to testify, but I would ask the Court to engage him in colloquy." The record reflects the following exchange between the trial justice and defendant:

> "THE COURT: * * * I don't know whether it's against the advice of counsel or not. You certainly don't have to disclose that. But, Mr. Delossantos, it is absolutely your right to testify. There's no question about it. And, I'm not going to anticipate specifically what conversations you've had with [the defense attorney], but more often than not counsel will advise their client to hold onto their right to remain silent because once you get up on the stand, you're also subject to cross-examination, something that [the defense attorney] has no control over at that point in time.
>
> Knowing all this, knowing that you have the right, as I told this jury repeatedly and will again at the end, to sit there and say and do absolutely nothing, is it your desire to take the stand or your desire to remain in silence and leave the State to its burden of proof? Which do you want to do?
>
> "THE DEFENDANT: I don't know what I want to do.
>
> "THE COURT: Do you want to testify or do you not want to testify?
>
> "THE DEFENDANT: I want to start off as firing my lawyer. I don't believe this is being processed as a fair trial on my behalf.
>
> "THE COURT: Okay, you're certainly allowed to discharge [the defense attorney], but you will continue representing yourself at this point. We don't -- it's not

- 10 -

like you get to fire him and we start all over again from the beginning, okay? We're going to finish this trial one way or the other.

"THE DEFENDANT: All right.

"THE COURT: You can do it with the assistance of [the defense attorney], who I can tell you is a more than capable attorney, someone who has -- when I practiced, I've had cases against him, and I found him to be one of the better ones out there. But, you're entitled to your opinion, and I don't know what your relationship is like with him. All I am telling you is that you can certainly discharge him, but you're going to finish the trial by yourself.

So, what's it that you want to do, sir?

"THE DEFENDANT: I don't know.

"THE COURT: I need an answer from you. Let's start first with [the defense attorney]. Are you asking that he be released from representing you as counsel?

That's a yes or no.

"THE DEFENDANT: Yes.

"THE COURT: Okay, so then you're prepared to continue this trial representing yourself?

"THE DEFENDANT: I believe so. You're saying that's my only choice.

"THE COURT: Well, the trial is --

"THE DEFENDANT: That's my only choice. You're not giving me no other choice.

"THE COURT: Okay, Mr. Delossantos, that's the second time I told you not to interrupt me when I'm talking. The third time, I assure you, will be the last.

You absolutely can represent yourself. I'm not telling you that you can't. But, what I am telling you is we've started this trial, we have selected a jury, the State has completed the presentation of its case. We don't now, at this point, fire counsel and start all over again. Is that what you were hoping was going to happen?

"THE DEFENDANT: No, that was never.

"THE COURT: Okay, so what was it that you were thinking when you said you wanted to fire [the defense attorney]? What did you think was going to happen if I said yes?

"THE DEFENDANT: I don't know. I didn't know if we were going to start all over. I didn't know. I just feel he's not helping me as much as I need him.

"THE COURT: Well, sometimes when counsel gives you advice, just because you don't like it doesn't mean it's not good advice, okay? So, as you just said, you were hoping you would get to start over. I'm telling you the law doesn't allow for that, okay? The jury has been sworn, we've started these proceedings, we're more than halfway done. So, you can either continue and finish this case representing yourself or [the defense attorney] will continue to represent you. What's it going to be? Knowing full off that [the defense attorney] has a law degree, has a number of years of experience in the Public Defender's Office, has represented murderers that I know he's gotten acquitted, so he's certainly capable and competent. But, if you think you know better, that's your choice.

"THE DEFENDANT: I don't know. I don't know.

"THE COURT: Okay, I need an answer from you, sir.

" * * *

- 12 -

"THE COURT: I've got a jury waiting, they're going to come down, so I need a decision from you.

"THE DEFENDANT: I just told you, I don't feel like this has been a fair trial. You're trying to make me --

"THE COURT: You're entitled to your opinion, sir.

"THE DEFENDANT: Yes.

"THE COURT: I need an answer from you. Do you want to proceed with [the defense attorney] or do you want to represent yourself for the remainder of the trial? There's two options. Tell me which one you are taking.

"THE DEFENDANT: I will proceed with [the defense attorney].

"THE COURT: Fantastic.
Number two, you have a right to testify in this matter. You absolutely do. You can present evidence on your own behalf and let the jury hear from you. You also have the right to remain silent. You have the right to sit there, say and do nothing, and leave the State up to their burden of proof. I know that you've had conversations with [the defense attorney] about it. He said, as a matter of fact, he's had a few discussions during the day. I need an answer from you right now whether or not you want to testify or whether you want to remain silent. Which is it?

"THE DEFENDANT: I want to testify."

## 5. The Testimony of Defendant

The defendant then testified that, upon arriving home from work on October 5, 2016, having been driven there by a friend, he was not able to enter the house because he did not have his keys. He further testified that he left the house and

"came back hours later" and saw that Veronica's car was there. He stated that he started to bang and kick on the door "to get in the house" and that, after fifteen to twenty minutes, Veronica opened the door. The defendant testified that he and Veronica started to argue and that she told him to leave the house. He stated that he packed a bag and started to leave the house, at which point Veronica and Sabrina tried to grab him to prevent him from leaving. The defendant also denied taking Veronica's car without permission; putting his hands on anyone; kicking anyone; or using a knife to puncture a tire. At the close of defendant's direct testimony, the court adjourned for the day.

## C

### The Third Day of Trial

November 14, 2019 was the third and final day of trial. As proceedings began on that day, defendant advised the trial justice that he now wished to discharge his attorney and represent himself. The trial justice advised defendant against representing himself, explaining that there are certain rules of evidence and procedures that must be followed in the courtroom. She asked defendant if he had attended law school or if he had ever practiced law. When defendant replied that he had neither attended law school nor practiced law, the trial justice again pointed out that defendant's attorney had attended law school and had practiced law. The trial justice again cautioned defendant against representing himself; and she

- 14 -

specifically advised him that, if he did, he would be held to the same standards as an attorney.

Next, the trial justice further explained to defendant that, if he did elect to represent himself, he would still be subject to cross-examination and would be responsible for apprising the court of any additional evidence that he might wish to present. She then asked him whether he felt he was in a better position than his attorney to give a closing argument. The defendant answered in the affirmative. The trial justice then explained to defendant: "I'm concerned, too, about the appearance that might make to the jury. [The defense attorney] has been with you throughout, and to use the metaphor, to change horses midstream may not be in your best interest." The trial justice again repeated her concerns about defendant representing himself and provided him fifteen minutes to meet with his attorney to see if defendant could "iron out whatever perceived differences" he had with his attorney.

After meeting with his attorney, defendant informed the court that he still wished to represent himself. The trial justice stressed the "inherent disadvantage to someone making this decision," and she emphasized her responsibility for ensuring that defendant was making the decision to represent himself voluntarily, knowingly, and intelligently. In response to the trial justice's questions, defendant stated that: (1) he had a tenth-grade education; (2) he could read and write the

- 15 -

English language; and (3) he had no "physical ailments or mental health ailments that might affect [his] ability to participate" in the trial.

In response to a question posed by the trial justice regarding his previous involvement with the criminal justice system, defendant said that he had been in attendance at a trial in Massachusetts and that he also had some knowledge of the trial process through watching television. The trial justice emphasized to defendant that his trial was unlike the trials on television because "[t]he stakes are real, and they're real for you." She asked the defendant whether he understood this, and he answered in the affirmative.

The trial justice then asked defendant to tell her what he understood would happen for the rest of the trial, specifically inquiring as to what defendant understood his obligations would be. The defendant stated that he was going to have to "[f]ight for [his] life and prove [himself] not guilty." When the trial justice asked defendant how he planned to do that, he replied: "With evidence." The trial justice then explained:

> "[W]hat I'm getting at right now is that you want to represent yourself at the very end of these proceedings, and I'm concerned about your ability to do so and the fact that [you're] making this waiver, as I said, intelligently and knowingly. And, I am just trying to point out to you that whatever you may think about [the defense attorney] personally, he does have the training and experience. He knows what the rules of evidence are. He knows how to make a closing argument. He prepared his last night. We went over the jury

instructions. All these things, as I said, he has the training and experience to do, and I'm concerned that you don't have that."

The defendant replied: "I don't." The trial justice then sought confirmation from defendant that, even knowing of his attorney's training and experience and his own lack of same, he nevertheless still wished to represent himself. The defendant once again expressed his desire to represent himself.

The trial justice then informed defendant that she would like his attorney "to stay as, what we call, standby counsel so [defendant] could consult him if [he had] any questions." When asked if that is something to which he would be agreeable, defendant replied in the negative. The trial justice explained to defendant that the attorney "would be available if [defendant] had a question about law or procedure or rules of evidence." The trial justice continued:

> "I can't force you to have him sit with you. I would advise you if you're going to undertake this representation, which, once again, I think is a bad decision, I'll be very candid with you. I think you're making a mistake. But, you have the right to do that. I just need to make sure that you're doing this voluntarily and that you know what the consequences are of representing yourself. So, if you are going to do that, and you acknowledge that [the defense attorney] has certain knowledge and experience that you don't have, what reason do you have for him not sitting there with you to assist you if you need it?"

The defendant answered: "Just the lack of approach."

The trial justice then asked defendant whether anyone had forced him to make the decision about representing himself. He replied: "No, I just see it as my life on the line. * * * I am fighting for my life." The trial justice continued:

> "I can disagree with your decision, but it's your decision to make. I just need to make sure that you have done it after thinking about all of the ramifications, the consequences, really the pitfalls of trying to represent yourself. You've indicated to me you have thought about it and that this is your desire?"

The defendant confirmed that he had thought about his decision, "from last night to today."

The trial justice then sought to further clarify what defendant's responsibilities would be. She said to him:

> "[Y]ou will be responsible for doing your closing statement. You will be responsible -- you're going to be asked questions on cross-examination, and you will be responsible for making any objections, any motions that need to be made, but I need to know whether or not you want [the defense attorney] to stay with you and assist you in that endeavor?"

The defendant ultimately changed his mind and agreed to have his attorney remain as standby counsel.

The trial justice permitted defendant to proceed *pro se*, and the trial continued with defendant (who had already testified on his own behalf) being cross-examined by the prosecutor. After the cross-examination was completed, the trial justice explained to the jury that defendant was now representing himself.

During the remainder of the trial, the trial justice reminded defendant several times that standby counsel was there to assist him, and she encouraged him to take advantage of his standby counsel's assistance.

Prior to the presentation of closing arguments, the trial justice granted defendant approximately an hour to confer with his standby counsel. The trial justice also told defendant that she would entertain a request for standby counsel to present the closing argument if defendant so desired. The defendant declined, and he proceeded to present his own closing argument. Thereafter, the trial justice requested that defendant's standby counsel assist him in reviewing the exhibits.

After closing arguments and the jury instructions, jury deliberations commenced. At the conclusion of the deliberations, which lasted for one hour and twenty minutes, the jury found defendant not guilty on Count One (assault with a dangerous weapon) and guilty on the remaining counts. On November 22, 2019, defendant filed a motion for a new trial; that motion was denied on January 3, 2020.[4] On February 21, 2020, defendant was sentenced.[5] He thereafter filed a timely notice of appeal to this Court.[6]

---

[4] The defendant was represented by counsel with respect to the motion for a new trial and at the sentencing hearing.

[5] The defendant was sentenced as follows: on Count Two five years, with three years to serve, with probation; on Count Three six years, with three years to serve, with probation; on Count Four one year to serve; on Count Five one year to

## II

## Issues on Appeal

On appeal, defendant contends that the waiver of his right to the assistance of counsel was not valid because it was not timely and because it was not made voluntarily, knowingly, and intelligently. The defendant also contends that the trial justice erred when she denied his motion for a new trial.

## III

## Standards of Review

## A

## The Standard as to the Waiver of the Right to Counsel

We have stated that "'[w]ith respect to a trial justice's determination as to whether or not a criminal defendant's waiver of his or her Sixth Amendment right to counsel is knowing, voluntary, and intelligent,' this Court reviews this constitutional inquiry *de novo.*" *State v. Cruz*, 109 A.3d 381, 389 (R.I. 2015) (quoting *State v. Sampson*, 24 A.3d 1131, 1139 (R.I. 2011)); *see also State v. Brumfield*, 900 A.2d 1151, 1153 (R.I. 2006); *State v. Laurence*, 848 A.2d 238, 253

---

serve; and on Count Six one year to serve. The sentences were all to run concurrently.

[6]     The defendant filed a notice of appeal on February 25, 2020, prior to the January 28, 2021 entry of the judgment of conviction. This premature notice of appeal is considered to be timely. *See State v. Franco*, 225 A.3d 623, 628 n.5 (R.I. 2020).

(R.I. 2004). However, "[e]ven when the *de novo* standard is applied to issues of constitutional dimension, we still accord a hearing justice's findings of historical fact, and inferences drawn from those facts, great deference in conducting our review." *Thornton v. State*, 948 A.2d 312, 316 (R.I. 2008); *see also State v. Eddy*, 68 A.3d 1089, 1098 (R.I. 2013); *Cruz*, 109 A.3d at 389; *Laurence*, 848 A.2d at 253.

## B

### The Standard Relevant to the Motion for a New Trial

In reviewing defendant's contention based on the "interest of justice" provision in Rule 33 of the Superior Court Rules of Criminal Procedure, we review the trial justice's ruling on the constitutional issue in a *de novo* manner. *See Price v. Wall*, 31 A.3d 995, 999 (R.I. 2011) ("This Court will * * * review a ruling concerning a defendant's constitutional rights *de novo*.").

In reviewing the trial court's decision concerning a new trial motion as to the weight of the evidence, this Court affords "great weight to a trial justice's ruling on a motion for a new trial if he or she has articulated sufficient reasoning in support of the ruling." *State v. Espinal*, 943 A.2d 1052, 1058 (R.I. 2008); *see also State v. Muralles*, 154 A.3d 925, 932 (R.I. 2017); *State v. Robat*, 49 A.3d 58, 71 (R.I. 2012). As such, "this Court will not disturb a trial justice's decision on a motion for a new trial unless 'the trial justice committed clear error or * * * he or she

overlooked or misconceived material and relevant evidence [relating] to a critical issue in the case.'" *Muralles*, 154 A.3d at 932 (quoting *State v. DiCarlo*, 987 A.2d 867, 871 (R.I. 2010)).

## IV

## Analysis

## A

## The Waiver of the Right to the Assistance of Counsel

We have stated that "[t]he Sixth Amendment to the United States Constitution and article 1, section 10, of the Rhode Island Constitution provide that in all criminal prosecutions, the accused enjoys the right to the assistance of counsel." *Laurence*, 848 A.2d at 252. It should be further noted, however, that "[t]he Sixth Amendment also allows a defendant in a criminal trial to represent himself, provided that his waiver of counsel is valid." *Id.*; *see also Faretta v. California*, 422 U.S. 806, 819 (1975) ("The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense."); *State v. Chabot*, 682 A.2d 1377, 1379-80 (R.I. 1996).

We have stated that "a defendant may proceed *pro se* if he or she wishes only so long as the waiver of his or her right to counsel is valid." *State v. Withers*, 172 A.3d 765, 771 (R.I. 2017); *see also State v. Segrain*, 252 A.3d 1255, 1273-74

(R.I. 2021).  We have also stated that, "[i]n order for a waiver to be valid, a defendant must waive his or her right to counsel voluntarily, knowingly, and intelligently." *Cruz*, 109 A.3d at 390.  In other words, a waiver is valid only when the defendant "knows what he or she is doing and his or her choice is made with eyes open." *Chabot*, 682 A.2d at 1380 (brackets and emphasis omitted) (quoting *Faretta*, 422 U.S. at 835).  When determining whether such a waiver was valid, "this Court employs a two-prong analysis * * *." *Cruz*, 109 A.3d at 390.  First, the Court must "determine whether the waiver was voluntary * * *." *Id.* (internal quotation marks omitted).  Next, the Court "must determine whether the waiver was knowing and intelligent." *Id.* (internal quotation marks omitted).  In conducting the "constitutional inquiry" as to whether a waiver was valid, "this Court examines the totality of the circumstances." *Id.*

### 1.  The Timeliness of Defendant's Waiver

The defendant asserts on appeal that his waiver of his right to the assistance of counsel was invalid because his request to proceed *pro se* was not timely made.  The defendant relies heavily on the case of *United States v. Betancourt-Arretuche*, 933 F.2d 89 (1st Cir.), *cert. denied*, 502 U.S. 959 (1991), in support of his argument that a request to proceed *pro se* is timely only when such a request is made prior to the jury being empaneled and sworn.  However, this Court has never opted to follow the First Circuit's rather bright-line approach in that regard and has

- 23 -

not adopted a strict temporal requirement as to when the waiver of the right to the assistance of counsel must be asserted in order for it to be valid. This Court has specifically endorsed an approach whereby we conduct a fact-specific "examination of the totality of the circumstances, in light of the particular stage of the proceedings at the time the waiver is proposed * * *." *State v. Spencer*, 783 A.2d 413, 417 (R.I. 2001); *see also Cruz*, 109 A.3d at 390; *Laurence*, 848 A.2d at 253.

It is our opinion, after carefully scrutinizing the trial transcript and especially the extensive colloquies between the trial justice and defendant, that defendant's decision in the midst of the trial to discharge his attorney (a decision that he made after having been unequivocally advised by the trial justice that such a decision would be unwise) was not rendered invalid because it was made at a relatively advanced stage of the proceedings.[7] The defendant had been made aware of the trial justice's advice to the contrary, and yet he opted to represent himself (albeit with standby counsel being present). Having reviewed the record in its entirety, we perceive no error in the trial justice's decision allowing defendant to discharge his attorney when and as she did.

---

[7] It should be recalled that the trial justice specifically informed defendant that, if he decided to discharge his attorney, that would not result in the trial starting all over again.

## 2. Voluntary, Knowing, and Intelligent Waiver

### i. The requirement that the waiver be voluntary

The defendant further contends that his waiver of counsel was not voluntarily, knowingly, and intelligently made because the trial justice did not "identify the specific disadvantages" that he would face by waiving his right to counsel. It is the state's position that "[t]he record supports the Superior Court's conclusion that [defendant] knowingly, voluntarily, and intelligently waived his right to counsel * * *."

Even though defendant's appellate argument focuses primarily on the "knowingly" and "intelligently" requirements, we shall nonetheless first briefly address the issue of whether defendant's waiver was made voluntarily. *See Cruz*, 109 A.3d at 390. This Court has recognized that "a defendant may demonstrate a voluntary waiver of the constitutional right to counsel by his or her actions." *State v. Souto*, 210 A.3d 409, 418 (R.I. 2019); *see generally State v. Thornton*, 800 A.2d 1016 (R.I. 2002).

In the instant case, the record indicates that, on the second day of trial, defendant first requested and then ultimately declined to dismiss his attorney. However, on the third and final day, after acknowledging the trial justice's numerous warnings, defendant nonetheless elected to dismiss his attorney. He unequivocally stated: "[I]t's my right to [waive counsel]." Furthermore,

immediately prior to granting defendant's request to proceed *pro se*, the trial justice asked defendant in plain English: "Has anybody forced you into making this decision?" To that question, defendant replied: "No."

For these reasons, and taking into account the colloquies that we have extensively quoted, we are more than satisfied that defendant's waiver was made voluntarily.

### ii. The requirement that the waiver be knowing and intelligent

A waiver is valid only if a defendant "knows what he is doing and his choice is made with eyes open." *Faretta*, 422 U.S. at 835 (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)); *see also Cruz*, 109 A.3d at 390. Accordingly, a criminal defendant "should be made aware of the dangers and disadvantages of self-representation." *Faretta*, 422 U.S. at 835.

This Court in *State v. Chabot*, 682 A.2d 1377 (R.I. 1996), pointed to six factors that a trial justice may use as a guide in determining whether a particular defendant's request for self-representation was made voluntarily, knowingly, and intelligently. The following are the factors referred to in *Chabot*:

> "(1) the background, the experience, and the conduct of the defendant at the hearing, including his age, his education, and his physical and mental health; (2) the extent to which the defendant has had prior contact with lawyers before the hearing; (3) the defendant's knowledge of the nature of the proceeding and the sentence that may potentially be []imposed; (4) the question of whether standby counsel has been appointed

and the extent to which he or she has aided the defendant before or at the hearing; (5) the question of whether the waiver of counsel was the result of mistreatment or coercion; and (6) the question of whether the defendant is trying to manipulate the events of the hearing." *Chabot*, 682 A.2d at 1380; *see also Segrain*, 252 A.3d at 1274 n.23.

Although the Court requires the consideration of the *Chabot* factors only in cases in which there is a concern about a defendant's competence,[8] it is still the better practice for those factors to be considered in other cases involving the waiver of counsel. *See Cruz*, 109 A.3d at 391 ("[W]e recommend, but do not require, the consideration of the *Chabot* factors under a trial justice's analysis of the totality of circumstances even in cases in which a defendant is considered competent."); *see also State v. Briggs*, 787 A.2d 479, 486 (R.I. 2001) ("While not mandatory, the factors set forth in *Chabot* may be used as a guide in determining a valid waiver of counsel."). In the instant case, while the trial justice was not required to utilize the *Chabot* factors in her assessment of the totality of the circumstances, the record reflects the conscientious and laudably patient manner in which she took virtually all of those factors into account. As a result of the trial justice's several colloquies with defendant, the well-developed record makes the following points clear.

---

[8] No issue has been raised as to the instant defendant's competence.

At the time of the trial, defendant had a tenth-grade education, could read and write the English language, and had no past or present mental health ailments. As for defendant's previous experience with lawyers, he was represented by his attorney throughout the first two days of trial and had previously attended a trial in Massachusetts. The defendant had been made aware of both the nature of the proceedings and the potential penalties that could be imposed. Additionally, there is no indication (and defendant does not so argue) that his waiver was the result of mistreatment or coercion. The defendant also had the benefit of having his previous attorney remain as standby counsel. In addition, the trial justice granted defendant an hour to meet with his standby counsel to prepare the closing argument that defendant would deliver; and, even though defendant at that point was representing himself, immediately prior to the time for closing argument, the trial justice stated that she would "at least entertain" a request that standby counsel "do the closing argument."[9] Standby counsel also assisted defendant in reviewing

---

[9]    Immediately prior to the presentation of closing arguments, the trial justice spoke as follows to defendant:

> "Okay, so before we bring the jury down * * * I just wanted to check in with you. [Standby counsel] had come before the lunch break and said -- or, I should say, he asked me that if you were to have a change of heart and you wanted him to do the closing argument, would I allow it? My original inclination was no because you have already made your decision. But, upon further consideration, I just indicated to [standby counsel] that if

the exhibits. Although we have no way of knowing defendant's private thoughts, there is no indication in the record to the effect that defendant's request to waive his right to counsel was an attempt to manipulate the proceedings. *See Chabot*, 682 A.2d at 1380. On the second day of trial, following defendant's initial request to represent himself, the trial justice made sure that defendant understood that the trial would proceed irrespective of whether he chose to proceed *pro se* or be represented by counsel. In spite of having been made aware of this, defendant still elected to represent himself the next day.

Significantly, the trial justice on several occasions also "made [defendant] aware of the dangers and disadvantages of self-representation * * *." *Chabot*, 682 A.2d at 1380 (quoting *Faretta*, 422 U.S. at 835). The record reflects laudably candid warnings by the trial justice concerning the dangers that self-represented defendants often encounter and also about the possibility that the jury might draw a negative inference from the fact that, in the midst of the trial, defendant's attorney was no longer actively representing him.[10] The defendant repeatedly

---

that was something you wanted, I would at least entertain the request. But, I don't know where your head is at. So, are you planning to do this closing yourself or would you like [standby counsel] to do it?"

The defendant declined, explaining that he was "planning on closing [him]self."

[10] With respect to defendant's desire to represent himself late in the course of the trial, the trial justice went out of her way to advise him about how the jury

- 29 -

acknowledged the trial justice's warnings and nonetheless elected to waive counsel. Accordingly, we are satisfied that defendant made his waiver "with eyes open." *Faretta*, 422 U.S. at 835 (quoting *Adams*, 317 U.S. at 279).

For these reasons, after careful and thoughtful *de novo* consideration of the totality of the circumstances at the time of defendant's waiver, we are satisfied that the record establishes defendant's voluntary, knowing, and intelligent waiver of his right to the assistance of counsel. As such, we conclude that defendant's waiver of that right was valid.[11]

**B**

**Motion for a New Trial**

The defendant also asserts on appeal that the trial justice improperly denied his motion for a new trial. He specifically argues that "[t]he interest of justice requires that [defendant] be given a new trial because the trial justice erroneously

---

might react to such a decision. For example, she addressed the following observation to him:

> "Mr. Delossantos, I'm concerned, too, about the appearance that might make to the jury. [The defense attorney] has been with you throughout, and to use the metaphor, to change horses midstream may not be in your best interest."

[11] The trial justice is to be commended for having engaged in numerous exceedingly careful and articulate colloquies with defendant concerning "the consequences of waiving the right to counsel and proceeding *pro se*." *State v. Laurence*, 848 A.2d 238, 254 (R.I. 2004).

permitted him to proceed *pro se* mid-trial, and did not make him aware of the perils of doing so."[12] Earlier in this opinion (*see* Part IV, section A *supra*), we have discussed at considerable length the following issues: (1) the timeliness of defendant's waiver of the right to the assistance of counsel; (2) the requirement that the waiver of counsel be voluntary; and (3) the requirement that the waiver be knowing and intelligent. At the end of that discussion, we concluded that defendant's waiver of his right to the assistance of counsel was valid. After a careful review of what we have written in Part IV, section A of this opinion, it continues to be our belief that our analysis and conclusions are fully consistent with the interest of justice; and we therefore conclude that the trial justice did not err in denying defendant's "interest of justice" motion for a new trial. *See State v. L'Heureux*, 787 A.2d 1202, 1209-10 (R.I. 2002).

We are likewise satisfied that the trial justice correctly undertook the required analysis in addressing the defendant's weight of the evidence challenge pursuant to Rule 33 of the Superior Court Rules of Criminal Procedure. *See State v. Morales*, 895 A.2d 114, 121 (R.I. 2006). In carrying out that responsibility, the trial justice found Veronica Flores to be "absolutely credible" and "very strong and intelligent." She also found Sabrina Flores and Robert Lescault to be credible. As

---

[12] Rule 33 of the Superior Court Rules of Criminal Procedure provides in pertinent part as follows: "On motion of the defendant the court may grant a new trial to the defendant if required in the interest of justice."

for the defendant's credibility, the trial justice summarized her assessment as follows:

> "[Y]ou got up on that stand and lied, the jury thought you lied, and I certainly thought you did too. Your story didn't make sense. It was inconsistent with the facts, the physical evidence, as well as that of any eye witnesses * * *."

The trial justice also stated that she "absolutely agree[d] with the jury's verdict up to and including the acquittal on Count 1." Nothing in the record leads us to conclude that the trial justice was either clearly wrong or that she overlooked or misconceived material and relevant evidence in her denial of the defendant's "weight of the evidence" motion for a new trial. *See Muralles*, 154 A.3d at 932.

## V

## Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record may be returned to that tribunal.



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE

Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Edward Delossantos. |
| **Case Number** | No. 2020-192-C.A. (P2/17-1272ADV) |
| **Date Opinion Filed** | March 13, 2023 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice William P. Robinson III |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Maureen B. Keough |
| **Attorney(s) on Appeal** | For State:<br><br>Virginia M. McGinn<br>Attorney General Department |
| | For Defendant:<br><br>Megan F. Jackson<br>Office of the Public Defender |